Michael Weinstein (No. 01613-1995)
Rachel A. Mongiello (No. 01624-2010)
**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
201-489-3000
201-489-1536  Facsimile
*Attorneys for Defendant, Muhammad Ammar Khan*

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ALDA LTD., CREATIVE EMPIRE GLOBAL LTD., ANTHONY GARY DARK, ENDESO LTD., DAVID ISAAC ETTEDGUI, NACIM OULD KADDOUR, DAVID MORRIS KELLY, MUHAMMAD AMMAR KAHN, JEFFREY ROBERT LEWIS, LOTUS TRADING SAL HOLDING, KAHSIF QADRI, AND CHAUDHRY MUHAMMAD ZEESHAN,<br><br>Defendants. | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY CIVIL ACTION NO. 17-cv-01287-CCC-MF<br><br><u>Civil Action</u> |

---

**MEMORANDUM OF LAW ON BEHALF OF DEFENDANT MUHAMMAD AMMAR KHAN IN SUPPORT OF THE MOTION TO DISMISS THE COMPLAINT AND FOR AN ORDER UNFREEZING ASSETS**

---

Of Counsel and On the Brief:
        Michael Weinstein

On the Brief:
        Rachel A. Mongiello

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ii

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF FACTS ............................................................................. 5

LEGAL ARGUMENT .................................................................................. 12

    I.    THE COURT SHOULD DISMISS THE SEC'S COMPLAINT FOR FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P. 12(**B**)(6)................................................................................................. 12

        A.    The SEC Has Failed to State a Claim Against Khan for Insider Trading. ................................................................................. 13

    II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF AGAINST KHAN BECAUSE FOREIGN CONTRACTS FOR DIFFERENCE ARE NOT SECURITIES SUBJECT TO REGULATION UNDER SECTION 10(B) OF THE EXCHANGE ACT OR RULE 10B-5 ........ 21

    III.    THE COURT SHOULD DISMISS THE COMPLAINT AGAINST KHAN FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FED. R. CIV. P. 12(**B**)(2). ..................................................................... 28

    IV.    THE COURT SHOULD DISMISS THE COMPLAINT AS AGAINST KHAN FOR INSUFFICIENT SERVICE OF PROCESS PURUSANT TO FED. R. CIV. P. 12(**B**)(5). ..................................................................... 32

    V.    THE COURT SHOULD DISSOLVE THE PORTION OF THE TRO FREEZING KHAN'S FUNDS AT RJO LTD. .................................................. 37

CONCLUSION ............................................................................................ 40

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Absolute Activist Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012)............................................................................25

*AngioDynamics, Inc. v. Biolitec AG.*,
  780 F.3d 420 (1st Cir. 2015)........................................................................34

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009)..................................................................................12

*In re Cendant Corp. Sec. Litig.*,
  190 F.R.D. 331 (D.N.J. 1999)......................................................................12

*Cephalon, Inc. v. Sun Pharm. Indus., Inc.*,
  No. 11-5474, 2011 WL 6130416 (D.N.J. Dec. 7, 2011)...................32, 34

*Curto v. A Country Place Condo. Assoc., Inc.*,
  No. 16-5928, 2016 WL 6434103 (D.N.J. Oct. 28, 2016) .......................38

*Dirks v. SEC*,
  463 U.S. 646 (1983).............................................................................. 14-15

*Fominyam v. Borgen*,
  No. 16-411, 2017 WL 1243139 (D.N.J. Jan. 20, 2017).........................32

*Globus Med., Inc. v. Vortex Spine, LLC*,
  605 F. App'x 126 (3d Cir. 2015) ...............................................................38

*Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*,
  988 F.2d 476 (3d Cir. 1993)........................................................................32

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers
  Local No. 70 of Alameda Cnty.*,
  415 U.S. 423 (1974)......................................................................................38

*Hassen v. Nahyan*,
  No. 09-1106, 2010 WL 9538408 (C.D. Cal. Sept. 17, 2010) ................36

*Ingris v. Bank of Am.*,
  No. 14-3726, 2015 WL 226000 (D.N.J. Jan. 16, 2015).........................38

*J. McIntyre Mach., Ltd. v. Nicastro*,
  564 U.S. 873 (2011)................................................................................28, 31

ii

*Lampe v. Xouth, Inc.*,
    952 F.2d 697 (3d Cir. 1991)................................................................32

*Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*,
    265 F.R.D. 106 (S.D.N.Y. 2010) ......................................................33

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)...................................................................24, 25

*Nabulsi v. Nahyan*,
    No. 06-2683, 2009 WL 1658017 (S.D. Tex. June 12, 2009)...........34-35

*In re Optimal U.S. Litig.*,
    865 F. Supp. 2d 451 (S.D.N.Y. 2012)..................................24, 26, 27

*Orsi v. Falah*,
    No. 11-10451, 2012 WL 4469120 (D. Mass. Sept. 25, 2012)...................34, 36, 37

*Pinker v. Roche Holdings Ltd.*,
    292 F.3d 361 (3d Cir. 2002)..............................................28, 29, 30

*Rio Props., Inc. v. Rio Int'l Interlink*,
    284 F.3d 1007 (9th Cir. 2002) ......................................................33, 34

*SEC v. Antar*,
    15 F. Supp. 2d 477 (D.N.J. 1998) ................................................13, 15

*Salovaara v. Jackson Nat'l Life Ins. Co.*,
    66 F. Supp. 2d 593 (D.N.J. 1999) ......................................................14

*SEC v. Alexander*,
    No. 00-7290, 2003 WL 21196852 (S.D.N.Y. May 20, 2003) ................................30

*SEC v. Babikian*,
    No. 14-1740, 2014 WL 2069348 (S.D.N.Y. Apr. 21, 2014) ....................................35

*SEC v. Chi. Convention Ctr., LLC*,
    961 F. Supp. 2d 905 (N.D. Ill. 2013) ................................................27

*SEC v. Compania Internacional Financiera S.A.*,
    No. 11-4904, 2011 WL 3251813 (S.D.N.Y. July 29, 2011)....................................26, 31

*SEC v. Gonzalez de Castilla*,
    No. 01-3999, 2001 WL 940560 (S.D.N.Y. Aug. 20, 2011)....................................30

*SEC v. Jammin Java Corp.*,
    No. 15-8921, 2016 WL 6595133 (C.D. Cal. July 18, 2016)....................................30

*SEC v. Maillard*,
No. 13-5299, 2014 WL 1660024 (S.D.N.Y. Apr. 23, 2014) ................................24, 25, 26, 31

*SEC v. Nagaicevs*,
No. 12-00413, 2013 WL 3730578 (N.D. Cal. July 12, 2013) ................................................34

*SEC v. Queri*,
No. 08-1367, 2009 WL 186017 (W.D. Pa. Jan. 26, 2009) ....................................................30

*SEC v. Sabrdaran*,
No.14-4825, 2015 WL 901352 (N.D. Cal. Mar. 2, 2015) ................................................24, 26

*SEC v. Suterwalla*,
No. 06-1446, 2008 WL 9371764 (S.D. Cal. Feb. 4, 2008)................................................ 23-24

*SEC v. Unifund SAL*,
910 F.2d 1028 (2d Cir. 1990)................................................................................................30, 35

*Smallwood v. Allied Pickfords, LLC*,
No. 08-2196, 2009 WL 3247180 (S.D. Cal. Sept. 29, 2009)................................................36

*United States v. Georgiou*,
777 F.3d 125 (3d Cir. 2015)................................................................................................24

*United States v. O'Hagan*,
521 U.S. 642 (1997)................................................................................................ 13-14, 19

*Weber v. Jolly Hotels*,
977 F. Supp. 327 (D.N.J. 1997) ................................................................................28, 29, 30

**Statutes**

15 *U.S.C.* § 78c ................................................................................................................22

Securities Exchange Act Section 27, 15 *U.S.C.* § 78aa ........................................................27, 29

Securities Exchange Act Section 10(b), 15 *U.S.C.* § 78j.................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 4 ................................................................................................ *passim*

Fed. R. Civ. P. 9(b) ................................................................................................12

Fed. R. Civ. P. 12(b) ................................................................................................ *passim*

Fed. R. Civ. P. 65 ................................................................................................3, 37, 38

Rule 10(b)(5), 17 *C.F.R.* § 240.10b-5................................................................................ *passim*

In lieu of an answer, Defendant, Muhammad Ammar Khan, improperly pled as Muhammad Ammar Kahn ("Khan"), respectfully submits this Memorandum of Law in support of his motion to dismiss the Amended Complaint (*see* dkt. entry no. 27) filed by the United States Securities and Exchange Commission ("SEC") pursuant to Fed. R. Civ. P. 12(b)(2), 12(b)(5) and 12(b)(6) and for an order declaring that Khan's funds be unfrozen.

## PRELIMINARY STATEMENT

The SEC brings this insider trading action against, among others, Khan, on the untenable theory that Khan received material, nonpublic information from a "tipper" and then traded on that information for a substantial profit.  Khan, like other similarly situated defendants, resides and trades outside of the United States.

According to the SEC's Amended Complaint, in December 2016, SoftBank Group Corp. ("SoftBank") and Fortress Investment Group, LLC ("Fortress") began discussing a potential transaction whereby SoftBank would acquire Fortress.  Several months later, on February 10, 2017, Khan purchased Fortress CFDs (as defined herein) -- trading vehicles outlawed in the United States by the SEC -- through a London-based investment brokerage firm, RJ O'Brien Ltd. ("RJO Ltd.").  Days later, between February 12 and 13, the consummation of SoftBank's acquisition of Fortress was "in serious doubt."  While it is reasonable to assume an individual possessing inside information would sell his shares in Fortress amidst this "serious doubt," Khan did not sell any portion of his Fortress CFDs during this time.  Then, on February 14, 2017, SoftBank announced that it entered an agreement to acquire Fortress, thus resulting in an increase in Fortress's share price.  Following the immediate rise in share price, Khan, as any prudent investor would, sold his shares in Fortress for a profit.  Notably, all of the other defendants first purchased shares in Fortress on February 14, 2017, four days after Khan, and on the exact day the acquisition was announced.  This distinction is critical.

Against this backdrop, Khan brings this motion to dismiss the SEC's claim against him based on numerous substantive and procedural deficiencies. Chief among the deficiencies in the SEC's pleading is the absence of any meaningful, non-conclusory factual allegations supporting the SEC's insider trading claim against Khan. To be clear, the SEC fails to provide *any* facts establishing *any* of the elements necessary to state a claim for tipper/tippee liability, including: (i) the identity of the alleged tipper; (ii) when, how or in what manner the unidentified tipper transmitted inside information to Khan; (iii) how and to whom the unidentified tipper breached a fiduciary duty; (iv) how Khan knew that the information was material and nonpublic; (v) how Khan knew the tipper breached a fiduciary duty; and *most critically* (vi) that Khan actually traded on the alleged inside information. That the SEC, whose Amended Complaint rambles over the course of 217 paragraphs, cannot even assert a single, specific factual allegation in support of their fraud-based claim against Khan confirms dismissal is appropriate. Stripping the SEC's pleading of its conclusory allegations, the SEC simply seeks to hold Khan liable for profiting on his trade in Fortress CFDs based on the highly speculative conclusions the SEC has reached.

In addition to failing to plead the elements necessary to state a claim for insider trading, the SEC's pleading fails as a matter of law because CFDs are not "securities" under the Exchange Act. To the contrary, CFDs are foreign-based investment vehicles that are outlawed in the United States. The SEC attempts to obscure this fatal fact by RJO Ltd. hedged its exposure on the Fortress CFD transactions with Khan by purchasing Fortress shares on the New York Stock Exchange. Notwithstanding the SEC's conclusory allegations, that RJO Ltd., unbeknownst to Khan, purchased Fortress shares from a US market does not somehow subject

Khan to liability in the United States.  Simply stated, Khan's alleged trades in Fortress CFDs are foreign-based transactions and, therefore, not subject to regulation by the Exchange Act.

Setting aside the SEC's palpably insufficient factual and legal basis for its claim against Khan, the Amended Complaint should also be dismissed for lack of personal jurisdiction. Pursuant to well-settled authority, a defendant in an insider trading case is only subject to jurisdiction in the United States if the plaintiff can demonstrate sufficient contacts between the defendant and the United States.  The SEC, however, cannot establish Khan possesses the requisite contacts with the United States sufficient to confer jurisdiction over him.  To the contrary, Khan, a Pakistani national living in Dubai, United Arab Emirates ("UAE") has no contact with the United States.  In fact, Khan has never been to, nor done business with any persons living in, the United States.  Khan's complete lack of contact with the United States warrants immediate dismissal of this action for lack of personal jurisdiction.

The SEC's pleading must also be dismissed for insufficient service of process under Fed. R. Civ. P. 12(b)(5).  The SEC purports to have properly served Khan via alternate service pursuant to Fed. R. Civ. P. 4(f)(3).  However, prior to resorting to alternate service, the SEC must first, consistent with governing UAE Rules, demonstrate a need for the court's intervention to effect service.  The SEC has made no such showing here and, therefore, its pleading against Khan should be dismissed for improper service of process.

In addition to seeking dismissal of the SEC's woefully deficient pleading, Khan also seeks an order dissolving the Court's prior temporary restraining order which, among other things, froze Khan's assets.  Pursuant to Fed. R. Civ. P. 65(b)(2), the temporary restraining order, entered on February 24, 2017, flatly expired as of March 10, 2017.  The SEC has not demonstrated good cause to extend the order, nor has it obtained Khan's consent for an

extension.   Accordingly, the Court should dissolve the temporary restraining order as against

Khan and order that his frozen funds be immediately released.

## STATEMENT OF FACTS

The facts set forth herein have been taken from the Amended Complaint (hereinafter, the "Complaint") and are assumed as true only for purposes of this motion in accordance with Fed. R. Civ. P. 12(b)(6). Factual allegations specific to defendants other than Khan are omitted.

According to the SEC, SoftBank, a Japanese multinational telecommunications and Internet technology company, and Fortress, a New York-based investment firm whose shares are traded on the New York Stock Exchange ("NYSE"), had been discussing, since December 2016, a potential deal whereby SoftBank would acquire Fortress. (Amended Complaint[1] ("Compl.") at ¶¶ 1-2, 8, 37.) Initially, the acquisition was expected to be finalized over the weekend of February 10-12, 2017, and Fortress's board was tentatively scheduled to approve the deal on February 12. (*Id.* at ¶ 8.) Without explaining why the transaction was not approved on February 12, the SEC alleges that Fortress's board did not consider the deal on February 12 and that "the consummation of the deal was in serious doubt at that time, due to unresolved issues that rose on the 12th." (*Id.*) The Complaint further claims that Fortress' board of directors received notice at 5:45 p.m. on Monday, February 13th, after trading had closed that day, that a board meeting was scheduled for February 14th regarding the SoftBank acquisition. (*Id.*) Fortress's board received an email at 11:02 a.m. on February 14, 2017 that included draft resolutions approving the transaction. (*Id.*)

After the US markets closed on February 14, 2017, SoftBank announced that it had entered into a "definitive agreement" to acquire Fortress for $3.3 billion in cash (the "Announcement"). (*Id.* at ¶ 55.) "Under the terms of the agreement, SoftBank would pay $8.08 per share, a premium of 38.6% over Fortress's closing price on February 13, 2017." (*Id.* at ¶ 56.)

---

[1] A true copy of the Amended Complaint is attached to the accompanying Certification of Michael Weinstein ("Weinstein Cert.") as **Exhibit A**.

5

Fortress' shares closed at $6.21 on February 14, 2017 and at $7.99 on February 15, 2017.  (*Id*. at ¶ 57.)

## <u>ALLEGED SUSPICIOUS TRADING</u>

The Complaint alleges that in the days leading up to the Announcement, the defendants "who are foreign traders trading through foreign accounts, amassed large, speculative positions in Fortress stock through derivative securities known as contracts for difference ('CFD') and spread bets."  (*Id.* at ¶ 3.)  According to the SEC, "CFDs and spread bets allow traders to speculate in the movement of an equity security on margin and thus require only a small outlay of cash to take large positions betting on the movement of the underlying security."  (*Id.*)  The SEC alleges that, with respect to the trades at issue in this matter, the "Defendants purchased Fortress CFDs and/or [] made spread bets on Fortress stock through foreign brokerage firms."  (*Id*. at ¶ 4.)  Then, according to the SEC, "[t]hese firms hedged their exposure by (i) purchasing Fortress shares on the NYSE through domestic brokerage firms; or (ii) purchasing CFDs or placing orders for Fortress shares through other foreign brokerage firms, which in turn purchased Fortress shares on the NYSE through domestic brokerage firms."  (*Id.*)

Non-party RJO Ltd. "is a United Kingdom-based brokerage firm" through which the SEC alleges Khan and others "traded in CFDs and spread bets referencing Fortress shares."  (*Id.* at ¶ 38.)  According to the SEC, "RJO Ltd. hedged its exposure on these transactions by simultaneously trading the referenced number of Fortress shares on the NYSE."  (*Id.*)

The SEC contends that these defendants traded on inside information obtained from one or more tippers.  To that end, the SEC alleges that "the pool of potential tippers in this case is limited."  (*Id.* at ¶ 9.)  This so-called limited pool of potential tippers "includes Board members, officers, and certain 'need to know' employees within Fortress and SoftBank, as well as the partners, investment bankers, attorneys, accountants and public relations firms engaged by those

two entities." (*Id.*) Incredibly, this purported limited "pool" includes (but may not be limited to) "certain employees" of the following ***twenty*** entities, many of which have an international presence and are amongst the largest players in their fields: (1) Morgan Stanley (American investment bank); (2) Davis Polk & Wardell LLP (American law firm); (3) Legance (Italian law firm); (4) Maples and Calder (Cayman Islands law firm); (5) Paul, Weiss, Rifkind, Wharton & Garrison LLP (American law firm); (6) Evercore Group, LLC (American investment bank); (7) Debevoise & Plimpton LLP (American law firm); (8) Gasthalter & Co. (American public relations firm); (9) Ernst & Young LLP (American accounting firm); (10) Skadden Arps Slate Meagher & Flom LLP (American law firm); (11) Willkie Farr & Gallagher (American law firm); (12) J.P. Morgan Securities LLC (American investment bank); (13) F.A.B. Partners (English capital firm); (14) Kirkland & Ellis LLP (American law firm); (15) KPMG, LLP (American accountant firm); (16) Linklaters LLP (English law firm); (17) Mizuho Securities (Japanese investment bank); (18) Sard Verbinnen & Co. (American public relations firm); (19) Morrison & Foerster LLP (American law firm); and (20) Weil, Gotshal & Manges LLP (American law firm). (*Id.*)

As it relates to Khan's trading in Fortress, the Complaint alleges that, unlike any of the other defendants, Khan began trading in Fortress as early as February 10, 2017, several days prior to the Announcement. (*Id.* at ¶¶ 8, 94.) According to the SEC, "[b]etween February 10 and February 14, 2015 [*sic*], [Khan] acquired CFDs referencing 400,000 shares of Fortress stock through orders placed with RJO Ltd." for a total purchase price of $2,426,648.19. (*Id.* at ¶ 94.) Then, the SEC alleges that "[o]n February 15, 2017, [Khan] closed his position on all of the Fortress CFDs he acquired from RJO Ltd." for a total sales prices of $3,180,000.00. (*Id.* at ¶ 95.) RJO Ltd., for its part, allegedly "hedged its exposure to [Khan] on these CFD trades by trading in

Fortress stock on the NYSE, purchasing 400,000 Fortress shares between February 10 and 14, 2017, and selling those 400,000 shares on February 15, 2017." (*Id.* at ¶ 96.) According to the SEC, Khan profited $753,351.81 through "trading in Fortress CFDs through RJO Ltd." (*Id.* at ¶ 97.) Based solely "[u]pon information and belief," the SEC alleges that Khan was "tipped and was in possession of material, nonpublic information about SoftBank's offer to acquire Fortress at a substantial premium over the stock price at the time he made the purchases alleged in this Complaint." (*Id.* at ¶ 98.) Notably, the SEC does not provide any facts concerning: (i) who "tipped" Khan; (ii) how Khan was "tipped"; (iii) when Khan was "tipped"; or (iv) where Khan was "tipped."

## KHAN'S OTHER UNRELATED TRADING

The Complaint also includes allegations concerning Khan's other, unrelated trades. For example, the SEC alleges that "[b]etween November 10 and 11, 2016, [Khan] purchased CFDs referencing 100,000 shares of Intrum Justitia stock through orders placed with RJO Ltd." for a total purchase price of "SEK 41,385,417.70." (*Id.* at ¶ 120.) Then, several days later, "[b]etween November 14, 2016, after the announcement that Intrum Justitia agreed to acquire Lindorff, and November 15, 2016, [Khan] closed his position on all of the Intrum Justitia CFDs he acquired from RJO Ltd." for a profit of "SEK 4,653,324.96 (approximately $509,862 USD)." (*Id.* at ¶¶ 121-22.) The SEC does not allege that Khan's trading in Intrum Justitia CFDs was based on alleged material, nonpublic information, nor does it allege that this trade was related in any way to Khan's trading in Fortress CFDs.

The SEC further alleges that on December 9, 2016, Khan "purchased CFDs referencing 100,000 shares of Sky PLC stock through orders placed with RJO Ltd." for a total purchase price of "GBP 817,195.08." (*Id.* at ¶ 134.) According to the SEC, "after the announcement that 21st Century Fox had offered to acquire Sky PLC, [Khan] closed his position on all of the Sky PLC

8

CFDs" for a profit of "GPB 208,853.41 (approximately $263,781 USD)."  (*Id*. at ¶¶ 135-36.) The SEC does not allege that Khan's trading in Sky PLC CFDs was based on material, nonpublic information, nor does it allege that this trade was related in any way to Khan's trading in Fortress CFDs.

The SEC next alleges that "[b]etween December 29, 2016 and January 6, 2017, [Khan] purchased CFDs referencing 135,000 shares of Cynosure stock through orders placed with RJO Ltd." for a total purchase price of $6,195,412.08.  (*Id*. at ¶ 146.)  According to the SEC, between January 23 and 30, 2017, nearly a month after he began purchasing Cynosure CFDs, Khan "closed his position on all of the Cynosure CFDs he acquired from RJO Ltd." for a profit of $222,686.45.  (*Id*. at ¶¶ 147-48.)  The SEC does not allege that Khan's trading in Cynosure CFDs was based on material, nonpublic information, nor does it allege that this trade was related in any way to Khan's trading in Fortress CFDs.

Next, the SEC alleges that on February 15, 2017, Khan "purchased CFDs referencing 200,000 shares of Unilever PLC stock through orders placed with RJO Ltd." for a total purchase price of "GBP 6,602,535.21."  (*Id*. at ¶ 175.)  According to the SEC, on February 17, 2017, Khan "closed his position on all of the Unilever PLC CFDs he acquired from RJO Ltd." for a profit of "GBP 746,278.33 (approximately $931,325 USD)."  (*Id*. at ¶¶ 176-77.)  The SEC does not allege that Khan's trading in Unilever PLC CFDs was based on material, nonpublic information, nor does it allege that this trade was related in any way to Khan's trading in Fortress CFDs.

Lastly, the SEC alleges that between February 7 and 13, 2017, Khan "purchased CFDs referencing 222,459 shares of Global Blood Therapeutics stock through orders placed with RJO Ltd." for a total purchase price of $4,077,497.18.  (*Id*. at ¶ 203.)  Then, on February 27, 2017, Khan "closed his position on CFDs referencing 45,464 of these shares[.]"  (*Id*.)  According to the

SEC, had Khan "kept his remaining Global Blood Therapeutics CFD positions open until after the publication of the Reuter's report on March 8, 2017," **which he did not**, Khan "had potential profits of at least $2,700,000."  (*Id.* at ¶ 204.)  The SEC does not allege that Khan's trading in Global Blood Therapeutics was based on material, nonpublic information, nor does it allege that this trade was related in any way to Khan's trading in Fortress CFDs.

## PROCEDURAL HISTORY

The SEC filed its initial complaint in this action on February 24, 2017 alleging one count for insider trading, in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5. (*See* dkt. entry no. 1 (complaint).)  Simultaneously with the filing of the complaint, the SEC, appearing *ex parte*, applied for and obtained a Temporary Restraining Order ("TRO").  (*See* dkt. entry no. 3 (TRO).)  The TRO, *inter alia*, froze the proceeds of the sale of the Fortress stock relating to the Maybank and RJO Ltd. customers; required the defendants' brokers to identify the names of the defendants and the accounts held by the defendants; provided for expedited discovery; and authorized alternate service on the defendants by serving the defendants' brokers or agents.  (*See id.*)

With respect to service, the TRO provided:

> [P]ursuant to Rule 4 of the Federal Rules of Civil Procedure, service of all pleadings and other papers . . . may be made by serving such documents on any of each Defendants' brokers or agents with whom the Defendant regularly interacts, or any of those institutions' respective affiliates, successors in interest and assigns, these entities having been acting in securities matters for the Defendants.

> . . . [P]ursuant to Rule 4 of the Federal Rules of Civil Procedure, service of all pleadings and other papers . . . may be made personally, by facsimile, by overnight courier, or by mail upon each Defendant, their attorneys, or any U.S. or foreign agents identified in the prior subparagraph to the extent permitted by law, or by an alternative provision for service permitted by Rule 4 of

the Federal Rules of Civil Procedure, or as this Court may direct
by further order.

[*Id.* at 9-10.]

Based on this, on March 17, 2017, the SEC sent the pleadings and filings by UPS Overnight to

RJO Ltd.'s General Counsel's office in London and by email to RJO Ltd.  (*See* dkt. entry no. 25-

1 (Murnahan Decl.), at ¶¶ 9, 11.)  By email on March 20, 2017, RJO Ltd.'s General Counsel

Mark Trafeli ("Trafeli") confirmed receipt of the SEC's pleadings and filings and confirmed that

the pleadings and filings had been forwarded to RJO Ltd.'s clients in question.  (*Id.* at ¶ 12 & Ex.

D.)

On March 17, 2017, this Court, pursuant to a consent order between the SEC and two

attorneys for some of the other defendants, ruled that the TRO would "remain in effect until such

time as the Court further orders."  (*See* dkt. entry no. 10 (Consent Order).)  Notably, neither

Khan nor his attorneys signed the consent order or approved the extension of the TRO.

On April 7, 2017, Defendants Creative Empire Global Limited ("Creative") and Lotus

Trading SAL Holding ("Lotus") moved to dismiss the SEC's complaint.  (Dkt. entry no. 19

(Notice of Motion).)  Thereafter, on April 28, 2017, the SEC filed an Amended Complaint, once

again alleging one count for insider trading, in violation of Section 10(b) of the Securities

Exchange Act and Rule 10b-5, but this time identifying the individual traders.  (*See* dkt. entry no.

27 (Amended Complaint).)

For the reasons stated herein, Khan moves to dismiss the Complaint, as it relates to Khan,

in its entirety.

**LEGAL ARGUMENT**

**I.     THE COURT SHOULD DISMISS THE SEC'S COMPLAINT FOR FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P. 12(b)(6).**

Pursuant to Fed. R. Civ. P. 12(b)(6), a complaint that fails "to state a claim upon which relief can be granted" must be dismissed.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  More than a "sheer possibility" of unlawful activity is necessary to fulfill this standard.  *Id.*  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 1950 (citation omitted).  Where the facts plead "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'"  *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).  Additionally, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* at 1949 (citing *Twombly*, 550 U.S. at 555, 557).

Insider trading claims are also subject to the heightened pleading standard set forth in Fed. R. Civ. P. 9(b).  *See In re Cendant Corp. Sec. Litig.*, 190 F.R.D. 331, 334-35 (D.N.J. 1999).  This rule "requires plaintiffs to plead 'the who, what, when, where and how: the first paragraph of any newspaper story.'"  *Id.* at 335 (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999).  "The purpose of Rule 9(b) is to provide notice of the precise misconduct with which defendants are charged in order to give them an opportunity to respond meaningfully to a complaint, and to prevent false or unsubstantiated charges."  *Id.* (internal quotations omitted).

12

As it relates to Khan, the Complaint contains nothing more than conclusory allegations which cannot serve as the basis for any legitimate, sustainable claim.  The SEC's woefully-deficient pleading fails to state a claim against Khan for a violation of Section 10(b) of the Exchange Act.  Accordingly, the Court should dismiss the Complaint as against Khan, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6).

> ### A.    The SEC Has Failed to State a Claim Against Khan for Insider Trading.

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 *U.S.C.* § 78j(b).  Among the rules and regulations promulgated under Section 10(b), Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme or artifice to defraud . . .
>
> (b) To make any untrue statement of a material fact or to omit a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading, or
>
> (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 *C.F.R.* § 240.10b-5.  "In short, the provisions discussed above prohibit a person from selling securities while in possession of material, nonpublic information."  *SEC v. Antar*, 15 F. Supp. 2d 477, 529 (D.N.J. 1998) (citing *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997)).  Information is considered material "if there is a substantial likelihood that a reasonable investor

13

would consider the information important in making an investment decision." *Id.* (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)).  To that end, the United States Supreme Court has recognized two types of insider trading: the classical theory and the misappropriation theory. *See O'Hagan*, 521 U.S. at 651-52.

Under the classical theory, "'§ 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information.'" *Salovaara v. Jackson Nat'l Life Ins. Co.*, 66 F. Supp. 2d 593, 600 (D.N.J. 1999) (quoting *O'Hagan*, 521 U.S. at 651-52).  "Trading on such information qualifies as a 'deceptive device' under § 10(b) because 'a relationship of trust and confidence exists between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with the corporation." *Id.* (quoting *O'Hagan*, 521 U.S. at 652).

Under the misappropriation theory, "a person commits fraud in connection with a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to *the source* of the information." *Id.* at 601 (quoting *O'Hagan*, 521 U.S. at 652).  "Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information." *O'Hagan*, 521 U.S. at 652.  Under either the classical or misappropriation theory, the insider's fiduciary duty requires the person who knows material nonpublic information either to abstain from trading on the information or to make a disclosure before trading. *See Dirks v. SEC*, 463 U.S. 646, 654 (1983) (citations omitted).

The classical and misappropriation theories also extend liability to situations where an insider, also known as a "tipper", shares inside information with another person, also known as a

14

"tippee", who then trades on the information.  *See id*. at 659.  A "tipper" is liable for insider trading only if he/she (1) knowingly or reckless tips, (2) information that he/she knows, or is reckless in not knowing, to be material and nonpublic, (3) in knowing or reckless violation of a duty to keep the information confidential, (4) for personal gain.  *See id*. at 659-64.  A tippee incurs liability if all those conditions obtain, ***plus*** (1) the tippee knows or is reckless in not knowing that the tip is material nonpublic information, (2) the tippee knows or should know that the tip was in breach of a fiduciary duty, and (3) the tippee intentionally or recklessly uses the information by trading or tipping for personal benefit.  *See id.*

Under any of these theories, the "SEC must prove that the defendant acted with scienter." *Antar*, 15 F. Supp. 2d at 529 (citing *Aaron v. SEC*, 446 U.S. 680, 691 (1980)).  To prove scienter, the SEC must show that the defendant lacked "a genuine belief that the information disclosed was accurate and complete in all material respects."  *Id*. (internal citation and quotation omitted). This includes both knowing and reckless misconduct.  *Id*.

Here, the SEC's claim against Khan is based on the tipper/tippee theory of liability.  The SEC, however, fails to plead sufficient (if any) facts to satisfy the necessary elements to impose either tipper or tippee liability and, therefore, it has failed to state a claim under this theory.

**1.     The Complaint Fails To Adequately Allege the Elements Necessary to State a Claim for Tipper Liability.**

The SEC's vague and unsupported allegations omit essential factual elements necessary to establish tipper liability.  To begin with, the SEC utterly fails to identify the alleged "tipper" of information or the source of the alleged "tip."  Instead, the SEC merely concludes that "Defendants were [] tipped material, nonpublic information about SoftBank's impending acquisition of Fortress in advance of their trading in Fortress CFDs[.]" (Compl. at ¶ 10.)  This conclusory statement falls far short of the fulfilling the SEC's heightened pleading requirements.

That the SEC cannot, at this point, provide *any* facts concerning the identity of the alleged "tipper" warrants immediate dismissal of the SEC's claim against Khan.

Attempting to mask this fundamental flaw, the SEC alleges that "the pool of ***potential tippers*** in this case is limited." (*Id*. at ¶ 9 (emphasis added).) Even a cursory review of the SEC's pleading, however, demonstrates that nothing could be further from the truth. Amazingly, this "limited pool" is not even confined to the board members of Fortress and Softbank. Rather, the so-called "limited pool" includes "Board members, officers and certain 'need to know' employees within Fortress and Softbank, ***as well as*** the partners, investment bankers, attorneys, accountants and public relations firms engaged by those two entities." (*Id*. (emphasis added).) This boundless list includes, ***but is not limited to***, employees of the following ***twenty*** entities, many of which have an international presence and are amongst the largest players in their fields: (1) Morgan Stanley (American investment bank); (2) Davis Polk & Wardell LLP (American law firm); (3) Legance (Italian law firm); (4) Maples and Calder (Cayman Islands law firm); (5) Paul, Weiss, Rifkind, Wharton & Garrison LLP (American law firm); (6) Evercore Group, LLC (American investment bank); (7) Debevoise & Plimpton LLP (American law firm); (8) Gasthalter & Co. (American public relations firm); (9) Ernst & Young LLP (American accounting firm); (10) Skadden Arps Slate Meagher & Flom LLP (American law firm); (11) Willkie Farr & Gallagher (American law firm); (12) J.P. Morgan Securities LLC (American investment bank); (13) F.A.B. Partners (English capital firm); (14) Kirkland & Ellis LLP (American law firm); (15) KPMG, LLP (American accountant firm); (16) Linklaters LLP (English law firm); (17) Mizuho Securities (Japanese investment bank); (18) Sard Verbinnen & Co. (American public relations firm); (19) Morrison & Foerster LLP (American law firm); and (20) Weil, Gotshal & Manges LLP (American law firm). (*Id.*) In other words, contrary to the

SEC's self-serving characterization, the "limited pool" of tippers includes any officer or employee of any company that had *any* involvement in SoftBank's acquisition of Fortress. Certainly, these allegations do not sufficiently identify the alleged tipper under any pleading standard, much less the heightened pleading standard applicable here.

The Complaint is likewise barren of any facts establishing that the unidentified tipper transmitted material, nonpublic information to Khan.  Rather, the SEC merely concludes that the unidentified tipper(s) from the massive pool "provided [] highly confidential information to Defendants[.]"  (*Id*. at ¶ 10.)  As it relates specifically to Khan's trading in Fortress CFDs, the SEC simply alleges, upon information and belief, that "[Khan] was tipped and was in possession of material, nonpublic information about SoftBank's offer to acquire Fortress at a substantial premium over the stock price[.]"  (*Id*. at ¶ 98.)  Notwithstanding these wholly conclusory allegations, the SEC fails to allege *any* facts setting forth how, when and/or in what manner the material, nonpublic information was transmitted to Khan.  In fact, the SEC fails to even allege a relationship between Khan and *any* of the countless potential tippers that would support an inference that Khan was even in contact with any of these unidentified individuals.  That Khan purchased Fortress CFDs several days before the Announcement and sold those CFDs for a profit following the Announcement, without anything more, does not even suggest, much less establish, that the unidentified "tipper" provided Khan with material, nonpublic information.

Because the SEC cannot even identify the alleged tipper or how and when the alleged tipper allegedly provided information to Khan, it likewise cannot set forth any facts to establish that this unidentified "tipper" breached any fiduciary duty by transmitting the alleged "tip."  The SEC attempts to side-step its pleading requirement by merely alleging that the unidentified tipper from the massive pool of possibilities "provided [] highly confidential information to Defendants

in breach of a fiduciary duty to the companies involved, or another individual misappropriated the information from an individual in the pool in violation of a fiduciary duty to an insider." (*Id.* at ¶ 10.)   The SEC, however, does not allege a single fact setting forth: (i) what duty the unidentified person owed; (ii) to whom the duty was owed; (iii) how the unidentified person allegedly violated his/her duty; and (iv) when the unidentified person allegedly violated his/her duty.  These critical factual omissions warrant dismissal.

Stripping the SEC's pleading of its conclusory allegations, the SEC alleges that an unidentified person provided Khan with material, nonpublic information at an unidentified time, in an unidentified manner, in violation of an unidentified duty to an unidentified person/company.  Even giving the SEC the benefit of every inference, the SEC has utterly failed to plead facts to establish tipper liability and, therefore, its claim against Khan must fail.

### 2.    The Complaint Does Not Sufficiently Allege That Khan Traded in Fortress CFDs Based on Inside Information.

Even if the SEC's desolate pleading can somehow be construed as sufficiently alleging tipper liability, its claim against Khan nevertheless fails because it does not allege any of the elements necessary to impose tippee liability upon Khan.

First, the Complaint fails to plead any facts to suggest that Khan knew or was reckless in not knowing (1) that the tip contained material, nonpublic information or (2) that the tip was made in breach of a fiduciary duty.  *See O'Hagan*, 521 U.S. at 652.  As explained at length above, the Complaint is completely devoid of ***any*** facts concerning the alleged tipper, the contents of any alleged tip, how and when the alleged tip was transmitted to Khan or what duty was allegedly violated by the tipper.  Absent this information, the SEC cannot establish that Khan knew or should have known that he was in possession of material, nonpublic information

18

or that the unidentified tipper breached any duty by making the tip.  As such, the SEC has failed to adequately plead the first two elements necessary to impose tippee liability upon Khan.

Finally, and most critically, the SEC fails to plead any facts demonstrating that Khan actually purchased the Fortress CFDs based on material, nonpublic information.  Instead, the SEC, true to form, simply concludes, as follows:

> Upon information and belief, [Khan] was tipped and was in possession of material, nonpublic information about SoftBank's offer to acquire Fortress at a substantial premium over the stock price at the time he made the purchases alleged in this Complaint.

(Compl. at ¶ 98.)  This wholly conclusory statement, made upon unspecified information and belief, is woefully deficient.  In fact, contrary to the SEC's bare conclusion, the facts pled in the Complaint actually undermine any suggestion that Khan purchased Fortress CFDs based on material, nonpublic information.  According to the SEC, "the SoftBank acquisition had been in discussions since December 2016."  (*Id*. at ¶ 8.)  The SEC, however, does not allege that Khan purchased any Fortress CFDs at this time.  Indeed, it was not until February 10, 2017, four days prior to the Announcement and four days before any other defendant purchased shares in Fortress, that Khan began purchasing Fortress CFDs.  (*Id*. at ¶¶ 58, 64, 76, 82, 88, 94, 99, 105.)  As of March 12, 2017, two days ***after*** Khan purchased Fortress CFDs, the SEC alleges that "due to several unresolved issues . . . ***the consummation of the deal was in serious doubt.***"  (*Id*. at ¶ 8 (emphasis added).)  In fact, it was not until 5:45 p.m., after the close of trading on February 13, 2017, that "Fortress's board received notice of a February 14th meeting regarding the acquisition."  (*Id*.)  During the course of all of this uncertainty and "serious doubt," Khan did not sell ***any*** of his Fortress CFDs and, in fact, continued purchasing Fortress CFDs at this time.  (*Id*. at ¶¶ 94-95.)  Had Khan truly possessed "inside information" regarding the Fortress acquisition, it is hard to imagine that he would continue to purchase Fortress CFDs while the deal appeared

19

to be falling apart.  Thus, the inference that the SEC asks this Court to draw -- that the timing of Khan's trading was suspicious and therefore he was trading on inside information -- is not reasonable and should be rejected.

In a transparent attempt to provide legitimacy to its deficient allegations concerning Khan's trading in Fortress CFDs, the SEC makes various allegations concerning five unrelated trades made by Khan.  These trades are a red-herring and not the subject of these proceedings in any event.  In particular, Khan's trading in other, unrelated CFDs has no relevance on whether Khan obtained and traded upon specific, nonpublic information concerning SoftBank's acquisition of Fortress.  In any event, Khan's prior trading history, as alleged by the SEC, actually undermines the SEC's hollow claim.  For example, the SEC alleges that "[o]n January 22, 2017, it was reported that Cynosure, Inc. ("Cynosure") . . . was exploring strategic options, including a sale[.]"  (*Id*. at ¶ 137.)  Then, on February 14, 2017, Cynosure announced that Hologic, Inc. agreed to acquire all outstanding Cynosure shares.  (*Id*. at ¶ 138.)  Khan, however, began purchasing Cynosure CFDs on December 29, 2016, nearly a month before reports of a Cynosure sale even surfaced.  (*Id*. at ¶ 146.)  Then, Khan sold his Cynosure CFDs by January 30, 2017, weeks before the sale was announced and the price of Cynosure stock rose significantly.  (*Id*. at ¶¶ 138, 147.)  Similarly, with respect to his trading in Global Blood Therapeutics, Khan ***closed his position in CFDs <u>prior</u> to an alleged major announcement***.  (*Id*. at ¶¶ 203-04.)  Had Khan not closed his CFD positions, he would have profited "at least $2,700,000."  (*Id*. at ¶ 204.)  The only reasonable inference that can be drawn from these trades is that Khan ***did not*** have inside information, or else he would have held the CFDs and made an immense profit which the SEC speculates on.

## II.   THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF AGAINST KHAN BECAUSE FOREIGN CONTRACTS FOR DIFFERENCE ARE NOT SECURITIES SUBJECT TO REGULATION UNDER SECTION 10(B) OF THE EXCHANGE ACT OR RULE 10B-5.

The sole count of the SEC's Complaint alleges that Khan and the other defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by trading in Fortress-based CFDs. However, CFDs are not "securities."  Further, Khan's alleged trades in Fortress CFDs are foreign-based transactions and, therefore, not subject to regulation by the Exchange Act.

Section 10(b) of the Exchange Act provides that "[i]t shall be unlawful for any person . . . [t]o use or employ, **in connection with the purchase or sale of any security registered on a national securities exchange** . . . any manipulative or deceptive device."  15 *U.S.C.* § 78j(b) (emphasis added).  Similarly, Rule 10b-5, enacted pursuant to Section 10(b) of the Exchange Act, states that "[i]t shall be unlawful for any person, directly or indirectly, . . . [t]o employ any device, scheme or artifice to defraud . . . **in connection with the purchase or sale of any security**."  17 *C.F.R.* § 240.10b-5(a) (emphasis added).  There can be no dispute that CFDs, which are outlawed in the United States, are not securities.  While the SEC defines a CFD as "a financial derivative security where the purchaser acquires 'the future price movement of the underlying company's common stock (positive or negative) without taking formal ownership of the underlying shares'" (dkt. entry no. 2-1 (SEC's Memo. of Law in Support of TRO) at 3 n.1 (quoting *Freudenberg v. E\*Trade Fin. Corp.*, No. 07-8538, 2008 WL 2876373, at \*7 (S.D.N.Y. July 16, 2008))), CFDs are not included the Exchange Act's extensive definition of "security."

*See* 15 *U.S.C.* § 78c(a)(10).[2]  Thus, the SEC's Complaint fatally lacks an essential predicate for

Section 10(b) and Rule 10b-5 liability -- the existence of a security.

      Further, the fact that RJO Ltd. may, in its discretion, hedge the CFDs by purchasing the

underlying stock is too attenuated to satisfy the "in connection with" test.  Foreign investors

trading in CFDs are actively avoiding trading securities in US markets by utilizing privately

negotiated agreements with their brokers.  The CFD transaction between the broker and investor

is complete at the time the broker accepts the investor's order.  That the broker, oftentimes

unbeknownst to the investor, subsequently and independently invests in the underlying common

stock to manage its own financial risk is entirely external and separate from the investor's CFD

trading.  The broker's discretionary decision, consistent with its own business strategy, to hedge

---

[2] The Exchange Act defines a "security" as:

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

[15 *U.S.C.* § 78c(a)(10).]

the CFDs is entirely immaterial and irrelevant to the investor, and the CFD transaction and does not link the investor to the relevant market.

Moreover, even if the brokers' hedging could, theoretically, satisfy the "in connection with" test, the SEC has not adequately pled the necessary connection between each of Khan's CFD trades and RJO Ltd.'s contemporaneous one-for-one purchase of Fortress shares.  As to RJO Ltd.'s hedging, the Complaint merely alleges:

> 4.   Defendants purchased Fortress CFDs . . . through foreign brokerage firms.   These firms hedged their exposure by (i) purchasing Fortress shares on the NYSE through domestic brokerage firms; or (ii) purchasing CFDs or placing orders for Fortress shares through other foreign brokerage firms, which in turn purchased Fortress shares on the NYSE through domestic brokerage firms.
>
> * * *
>
> 38.  . . . RJO Ltd. hedged its exposure on [its customers' Fortress CFD trades] by simultaneously trading the referenced number of Fortress shares on the NYSE.
>
> * * *
>
> 96.  RJO Ltd. hedged its exposure to [Khan] on these CFD trades by trading in Fortress stock on the NYSE[.]

[Compl. at ¶¶ 4, 38, 96.]

This stands in sharp contrast to the allegations in the cases in which courts have found the "in connection with" test satisfied by the brokers' hedging.

For example, in *SEC v. Suterwalla*, the SEC alleged that the investor, who was previously a stockbroker who sold spread bets (instruments similar to CFDs), knew that the brokers would hedge his bets and that his "bets triggered the virtually contemporaneous purchase of a corresponding amount of [the underlying securities] by the [brokers] to protect themselves from the significant financial risk."  *SEC v. Suterwalla*, No. 06-1446, 2008 WL 9371764, at *3 (S.D.

Cal. Feb. 4, 2008).  Similarly, in *SEC v. Maillard*, the SEC met the "in connection with" test by allegations that the investor's purchase of CFDs "directly caused [the broker] to purchase securities that were listed on the NYSE."  *SEC v. Maillard*, No. 13-5299, 2014 WL 1660024, at *3 (S.D.N.Y. Apr. 23, 2014).  Unlike the allegations in *Maillard* and *Suterwalla*, the Complaint here does not allege causation and temporal proximity between *each* of the investors' CFD trades and the brokers' *matching* trades in Fortress shares on the NYSE.  Where such necessary allegations are absent, courts have concluded that the complaints did not adequately alleged that the investors' trading was "in connection" with the purchase or sale of a security.  *See, e.g.*, *SEC v. Sabrdaran*, No.14-4825, 2015 WL 901352, at *10-11 (N.D. Cal. Mar. 2, 2015) (concluding that the SEC did not sufficiently plead that the brokers automatically purchased the underlying securities contemporaneously with the spread bets); *In re Optimal U.S. Litig.*, 865 F. Supp. 2d 451, 455 (S.D.N.Y. 2012) (dismissing the Section 10(b) claim where the allegations did not sufficiently establish a direct correlation between the investor's trading and the purchase of securities on the NYSE).

Furthermore, the Exchange Act does not apply extraterritorially to the foreign-based transactions at issue in the Complaint.  *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265, 269-70 (2010).  Where the alleged securities at issue are not traded on a domestic exchange, like the Fortress CFDs at issue here, the transaction will still be considered domestic "when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States."  *United States v. Georgiou*, 777 F.3d 125, 135 (3d Cir. 2015) (quoting *Absolute Activist Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012)).  Factors that indicate "'irrevocable liability' include the 'formation of the contracts, the

placement of purchase orders, the passing of title, or the exchange of money.'"   *Id.* at 136 (quoting *Absolute Activist*, 677 F.3d at 69, 70).

Here, with respect to Khan's trading in Fortress CFDs, irrevocable liability was unequivocally incurred occurred outside of the United States.  During the transactions, Khan was in Dubai and RJO Ltd. was located in London.  (*See* Compl. at ¶¶ 30, 38.)  The derivative instruments at issue -- CFDs -- **are outlawed in the United States**.  Moreover, once RJO Ltd. accepted Khan's CFD order, the contract was formed, there was a "meeting of the minds," and the transaction was complete.  *See Absolute Activist*, 677 F.3d at 68.  RJO Ltd. had the discretion to accept the CFD contract without purchasing the corresponding quantity of the underlying shares.  The CFD contracts at issue were indisputably formed outside of the United States independent of any hedging by RJO Ltd.  Thus, the Complaint here is an improper attempt by the SEC to enforce the Exchange Act against foreign transactions, in contravention of the "presumption against extraterritorial[]" application described in *Morrison*.  The SEC failed to allege that Khan was engaged in any domestic securities transactions, and Section 10(b) and Rule 10b-5 liability cannot be premised on these foreign-based transactions.[3]

Even if such CFD transactions could theoretically be deemed domestic for insider trading purposes, here, the SEC has not sufficiently pled facts evidencing that the transactions were truly domestic in nature.  *See Morrison*, 561 U.S. at 247.  In cases in which courts have upheld complaints relating to CFD-like instruments over a motion to dismiss, the connection between CFD transaction and the broker's hedge was more pronounced and causally related.  In *Maillard*,

---

[3] It is irrelevant, for legal purposes, that the conclusion that foreign CFDs are not subject to the Exchange Act, may "create a huge hole in the enforcement regime governing companies listed in the United States."  *See Maillard*, 2014 WL 1660024, at *5 n.5.  The remedy for such a gap is amendment to the Exchange Act, not an improper judicial expansion of the Act in contravention of *Morrison* and the express language of the statute.

for example, the court relied upon allegations that the investor's CFD purchase "directly caused" the broker's purchase of the exchange-listed security. *Maillard*, 2014 WL 1660024, at *3. Likewise, in *Sabrdaran*, the SEC alleged that the investor's broker advised him that it may hedge by purchasing shares of the underlying security. *Sabrdaran*, 2015 WL 901352, *14. Similarly, the investor in *SEC v. Compania Internacional Financiera S.A.* knew that the broker would simultaneously trade the underlying securities at the time of the CFD transactions. *SEC v. Compania Internacional Financiera S.A.,* No. 11-4904, 2011 WL 3251813, *5-6 (S.D.N.Y. July 29, 2011).

In contrast to the more robust allegations at issue in *Maillard*, *Sabrdaran*, and *Compania*, the Complaint here does not plead facts showing a causal and temporal connections between the CFD transactions and the brokers' trades of US securities, nor does it allege facts showing that Khan knew that RJO Ltd. would (or even may) hedge the CFDs. The SEC is silent as to whether RJO Ltd. matched all of Khan's individual CFD orders, one-for-one, by purchasing the same number of Fortress shares as Khan ordered and when RJO Ltd. hedged each of Khan's Fortress CFD orders. *See In re Optimal U.S. Litig.*, 865 F. Supp. 2d at 456 (plaintiffs failed to overcome the presumption against the extraterritorial reach of the Exchange Act where there were no allegations of "one-to-one relationship with the U.S. security referenced" and the relationship between investors' orders and the trading of shares on the NYSE was "attenuated (and hypothetical)"). The Complaint here lacks the detailed allegations at issue in *Compania*, where the SEC alleged *identical matched transactions* involving the underlying stock *immediately prior* to RJO Ltd.'s consummation of the CFD transaction. Instead, the Complaint obliquely alleges that "RJO Ltd. hedged its exposure . . . by trading in Fortress stock on the NYSE . . . between February 10 and 14, 2017" (*see* Compl. at ¶ 96), without connecting the hedging to RJO Ltd.'s

26

virtually simultaneous purchase of the same number of shares prior to acceptance of Khan's Fortress CFD orders.  Further, unlike the facts in *Sabrdaran* and *Compania*, the Complaint does not provide any facts that even suggest that Khan was aware that RJO Ltd. might hedge any portion of his CFD trades.[4]  The SEC has alleged nothing to suggest RJO Ltd.'s hedging was anything other than the discretionary action of a third party that was entirely independent, irrelevant, and immaterial to Khan and his CFD transactions.

The "in connection with" language of the Exchange Act "cannot be construed as broadly in the context of the extraterritorial reach of the Exchange Act . . . because there is a presumption against extraterritorial application of the Exchange Act." *In re Optimal U.S. Litig.*, 865 F. Supp. 2d at 454.  Here, absolutely no allegations connect Khan's CFD trades with a domestic transaction.  Thus, the SEC has not overcome *Morrison*'s presumption against extraterritorial application of the Exchange Act.

Because Khan's CFDs were not securities and the CFD trades were entirely foreign-based transactions, the SEC has failed to plead the necessary prerequisites to Exchange Act liability and, therefore, the Complaint must be dismissed.

---

[4] The SEC's failure to allege Khan's knowledge that RJO Ltd. was likely to hedge the Fortress CFDs is fatal to its alternate basis for jurisdiction under the Exchange Act.  As an alternative to its assertion that the transactions at issue in the Complaint were domestic securities transactions, the SEC argues that jurisdiction is proper pursuant to Section 27(b) of the Exchange Act.  (*See* SEC's Memo. of Law in Support of TRO at p. 10 n.2.)  Section 27(b) states that district courts have jurisdiction over SEC actions alleging antifraud violations based on "conduct occurring outside the United States that has a foreseeable substantial effect within the United States."  15 *U.S.C.* § 78aa(b)(2).  The SEC has not alleged that Khan was aware of RJO Ltd.'s hedging, and, in the absence of Khan's knowledge, the effect of his CFD trading on the US was not foreseeable.  Moreover, Section 27(b) is a jurisdictional provision and does not address whether the underlying transaction itself is substantively covered by the Exchange Act.  *See SEC v. Chi. Convention Ctr., LLC*, 961 F. Supp. 2d 905, 916 (N.D. Ill. 2013).  Reliance upon Section 27(b) does not negate the SEC's obligation to rebut *Morrison*'s presumption against extraterritoriality.

III.    **THE COURT SHOULD DISMISS THE COMPLAINT AGAINST KHAN FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(2).**

Under well-established due-process principles, "[a] court may subject a defendant to judgment only when the defendant has sufficient contacts with the sovereign 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)).  "[T]he sovereign's exercise of power requires some act by which the defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

There are two distinct types of personal jurisdiction -- general and specific jurisdiction. General jurisdiction "is established when a defendant's contacts with the forum are 'continuous and systematic,'" and those contacts need not be related to the underlying cause of action. *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 n.1 (3d Cir. 2002) (quoting *Int'l Shoe*, 326 U.S. at 317).  Alternatively, "specific jurisdiction may be exercised only when the defendant has constitutionally sufficient minimum contacts with the forum, and where subjecting the defendant to the court's jurisdiction comports with traditional notions of fair play and substantial justice." *Id.* at 369 (internal quotation marks and citations omitted).  With respect to specific jurisdiction, "the plaintiff's cause of action is related to or arises out of the defendant's contacts with the forum." *Id.* at 368.

"Once the defendant properly disputes the existence of personal jurisdiction, the plaintiff bears the burden to establish, by a preponderance of the evidence, sufficient facts demonstrating the court's jurisdiction." *Weber v. Jolly Hotels*, 977 F. Supp. 327, 331 (D.N.J. 1997); *see also Pinker*, 292 F.3d at 368 ("Plaintiff bears the burden of demonstrating the facts that establish

personal jurisdiction.").  To meet this burden, the "plaintiff must present a prima facie case for the exercise of personal jurisdiction by 'establishing with reasonable particularity sufficient contacts between the defendant and the forum state.'"  *Weber*, 977 F. Supp. at 331 (quoting *Mellon Bank (East) PSFS Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)).  "At no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction.  "Once the motion is made, plaintiff must respond with ***actual proofs, not mere allegations***."  *Id.* (emphasis added) (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 67 n.9 (3d Cir. 1984)).

Congress has authorized nationwide service of process in Section 27 of the Exchange Act, and thus, "jurisdiction may be assessed on the basis of the defendant's national contacts" and is not "confined by the defendant's contacts with the state in which the federal court sits."  *Pinker*, 292 F.3d at 369.  Courts therefore must consider the extent to which the defendant "availed himself of the privileges of American law and the extent to which he could reasonably anticipate being involved in litigation in the United States."  *Id.* at 370 (internal quotation marks and citation omitted.)  "Once minimum contacts have been established, we assess whether the exercise of personal jurisdiction is consistent with 'traditional notions of fair play and substantial justice.'"  *Id.* (quoting *Int'l Shoe*, 326 U.S. at 316).  This inquiry focuses "on the national interest in furthering the policies of the law(s) under which the plaintiff is suing."  *Id.* at 370-71.

Khan does not have the requisite contacts with the United States sufficient for either general or specific personal jurisdiction.  Khan is a Pakistani national living in Dubai.  (Compl. at ¶ 30.)  The SEC has not (and cannot) allege that Khan has even been to the US, that he owns property in the US, or that he conducts business in the US or with US-based persons or entities.  Thus, there is no basis to conclude that Khan has ***any*** contact with the United States, much less

the "continuous and systematic" contacts with United States for the exercise of general jurisdiction. *See Pinker*, 292 F.3d at 368 n.1.

Khan's trades in the Fortress CFDs, from Dubai, with RJO Ltd., in London, do not establish the requisite "minimum contacts" for personal jurisdiction. Several courts have held that trading in the stock of a US security listed on a US stock exchange based on material nonpublic information subjects defendants to specific jurisdiction in litigation relating to those trades because the effects of the defendants' actions in the US were foreseeable. *See, e.g.*, *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990); *SEC v. Jammin Java Corp.*, No. 15-8921, 2016 WL 6595133, at *9 (C.D. Cal. July 18, 2016); *SEC v. Gonzalez de Castilla*, No. 01-3999, 2001 WL 940560, at *5 (S.D.N.Y. Aug. 20, 2011); *SEC v. Queri*, No. 08-1367, 2009 WL 186017, at *6 (W.D. Pa. Jan. 26, 2009); *SEC v. Alexander*, No. 00-7290, 2003 WL 21196852, at *2 (S.D.N.Y. May 20, 2003). The SEC relies upon these precedents as its basis for personal jurisdiction over the defendants. (*See* SEC's Memo. of Law in Support of TRO at 11.) However, the SEC does not, and cannot, allege that Khan traded U.S. securities on a U.S. exchange. RJO Ltd.'s independent decision to hedge the Fortress CFDs by subsequently purchasing Fortress shares on the NYSE is not a sufficient basis for the assertion of jurisdiction over Khan because Khan did not purposely avail himself of the privilege of conducting activities in the US. To the contrary, Khan declined to engage with the US markets at all and, instead, privately negotiated derivative instruments with RJO Ltd. -- instruments that are not permitted within the US.

Other decisions involving foreign CFD transactions have found that the SEC met its burden of establishing personal jurisdiction where the SEC alleged (and provided proof, as the SEC is required to do with Rule 12(b)(2) motions, *see Weber*, 977 F. Supp. at 331) that the

investors targeted the US markets with the CFDs and **knew** that their CFD trading would cause the brokers to make **matching** trades in the same amount of the underlying securities **simultaneously** with the CFD trades. *See, e.g.*, *Maillard*, 2014 WL 1660024, at \*2 ("[T]he SEC has presented ample evidence from which the court can conclude that [the investor] was a sophisticated investor who knew that his purchase and sales of CFDs were triggering corresponding purchases and sales by [the broker] on the New York Stock Exchange[.]"); *Compania*, 2011 WL 3251813, \*5 ("[The investor] knew that a broker would simultaneously cover a sale of a CFD with the purchase of the underlying security, because not to do so would . . . put the broker's portfolio 'in a completely mad position.'").  Such allegations and proofs of Khan's purposeful availment of the US markets are unmistakably absent.  Nowhere in the Complaint does the SEC allege that Khan knew or even suspected that the CFD transactions would cause RJO Ltd. to trade the underlying securities in the same amount at the same time.  Rather, the SEC simply alleged that RJO Ltd. hedged the Fortress CFDs by purchasing Fortress shares.  (*See* Compl. at ¶¶ 4, 38, 96.)  The CFD transaction was complete when Khan's CFD orders were accepted by RJO Ltd., and RJO Ltd.'s subsequent discretionary trading of Fortress shares to manage its financial risk is inconsequential.

The exercise of personal jurisdiction over a foreign defendant requires some sort of consent to -- or intent to benefit from -- the forum on the part of the defendant.  *J. McIntyre Mach., Ltd.*, 564 U.S. at 880.  Here, the SEC fails to allege that Khan, by purchasing Fortress CFDs, consented in any way to the forum or purposefully availed himself of the US markets.  A third party's independent business decision, which was immaterial to Khan with respect to his CFD orders, does not, and cannot, support a conclusion that Khan purposefully availed himself of the US markets, particularly where there is no suggestion that he was even aware of RJO

Ltd.'s hedging.  For these reasons, this Court lacks personal jurisdiction over Khan, and the Complaint must be dismissed.

## IV.  THE COURT SHOULD DISMISS THE COMPLAINT AS AGAINST KHAN FOR INSUFFICIENT SERVICE OF PROCESS PURUSANT TO FED. R. CIV. P. 12(b)(5).

Pursuant to Fed. R. Civ. P. 12(b)(5), a complaint may be dismissed for insufficiency of service of process.  "A motion to dismiss under Fed. R. Civ. P. 12(b)(5) for insufficiency of service of process contends that the Defendant did not receive sufficient notice of the action as set forth in Rule 4."  *Cephalon, Inc. v. Sun Pharm. Indus., Inc.*, No. 11-5474, 2011 WL 6130416, at *1 (D.N.J. Dec. 7, 2011) (quotation omitted).  It is well-established that proper service, in compliance with Rule 4, is a prerequisite to a court's exercise of jurisdiction over a defendant. *See Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 492 (3d Cir. 1993) ("A district court's power to assert *in personam* authority over parties defendant is dependent not only on compliance with due process but also on compliance with the technicalities of Rule 4."); *Lampe v. Xouth, Inc.*, 952 F.2d 697, 700-01 (3d Cir. 1991) ("A court obtains personal jurisdiction over the parties when the complaint and summons are properly served upon the defendant.  Effective service of process is therefore a prerequisite to proceeding further in a case."); *Fominyam v. Borgen*, No. 16-411, 2017 WL 1243139, at *2 (D.N.J. Jan. 20, 2017) ("Because Defendants have not been served, the Court lacks personal jurisdiction over Defendants.").  The party asserting the validity of service, here, the SEC, "bears the burden of proof" on the issue of proper service.  *Grand Entm't Grp., Ltd.*, 988 F.2d at 488.

When an individual is served in a foreign country, the Plaintiff must show that this service was made in accordance with Federal Rule of Civil Procedure 4(f) ("Rule 4(f)").  Rule 4(f) provides:

**Serving an Individual in a Foreign Country.** Unless federal law provides otherwise, an individual--other than a minor, an incompetent person, or a person whose waiver has been filed--may be served at a place not within any judicial district of the United States:

**(1)** by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

**(2)** if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:

**(A)** as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;

**(B)** as the foreign authority directs in response to a letter rogatory or letter of request; or

**(C)** unless prohibited by the foreign country's law, by:

**(i)** delivering a copy of the summons and of the complaint to the individual personally; or

**(ii)** using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or

**(3)** by other means not prohibited by international agreement, as the court orders.

Here, the SEC purports to have properly served Khan pursuant to subsection (3), based on the TRO authorizing service on defendants through their brokers.  (*See* Murnahan Decl. at ¶¶ 1, 4-5.)

Courts have consistently ruled that Rule 4(f)(3) is not automatically or immediately available to a plaintiff.  Instead, a plaintiff must "demonstrate that the facts and circumstances . . . necessitate[] the district court's intervention" to effect service.  *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1016 (9th Cir. 2002); *see also Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 115-16 (S.D.N.Y. 2010) (stating that requiring the plaintiff to show the need for court intervention is necessary "to prevent parties from whimsically seeking alternate means of service and thereby increasing the workload of the

courts" (internal quotation marks and citation omitted)).[5]  Indeed, before resorting to alternate

service mechanisms, a plaintiff must "attempt[] to effectuate service in ways that would do less

violence" to the laws of the foreign jurisdiction by "demonstrate[ing][a] serious effort to use

accepted methods of service" in that jurisdiction.  *Orsi v. Falah*, No. 11-10451, 2012 WL

4469120, at *3 (D. Mass. Sept. 25, 2012), *aff'd*, No. 12-2400 (1st Cir. Apr. 22, 2013).

Similarly, this Court has denied requests for alternate service where the plaintiff failed to

demonstrate "due diligence" in attempting to serve the defendant in another country and

otherwise failed to "establish[] circumstances to warrant reliance on Rule 4(f)(3)."  *Cephalon,*

*Inc.*, 2011 WL 6130416, at *5.  In cases where alternate service was ordered or upheld, the

plaintiff made a showing that either the ordinary service methods have not been successful or

that a foreign defendant is "striving to evade service of process."  *Rio Props., Inc.*, 284 F.3d at

1016; *see also AngioDynamics, Inc.*, 780 F.3d at 429 (no abuse of discretion where district "was

presented with 'an elusive international defendant, striving to evade service'" (quoting *Rio*

*Props., Inc.*, 284 F.3d at 1016)); *SEC v. Nagaicevs*, No. 12-00413, 2013 WL 3730578, at *1-2

(N.D. Cal. July 12, 2013) (SEC initially attempted service pursuant to the Hague Convention but

the filing was returned because the defendant could not be located); *Nabulsi v. Nahyan*, No. 06-

2683, 2009 WL 1658017, at *11 (S.D. Tex. June 12, 2009) (denying request for Rule 4(f)(3)

---

[5] To be clear, the SEC was not required to actually attempt service under Rule 4(f)(1) or (2)
before seeking alternative service.  *See Rio Props., Inc.*, 284 F.3d at 1015 ("[N]o language in
Rules 4(f)(1) or 4(f)(2) indicates their primacy, and certainly Rule 4(f)(3) includes no qualifiers
or limitations which indicate its availability only after attempting service of process by other
means."); *AngioDynamics, Inc. v. Biolitec AG*, 780 F.3d 420, 429 (1st Cir. 2015) ("Rule 4(f)(3)
does not require exhaustion of all possible methods of service before a court may authorize
service by 'other means[.]'").  Nonetheless, the SEC was not entitled to alternate service as a
matter of course.  Rather, the SEC needed to present "facts and circumstances . . . necessitat[ing]
the district court's intervention."  *Rio Props., Inc.*, 284 F.3d at 1016; *see also AngioDynamics,*
*Inc.*, 780 F.3d at 429 (no abuse of discretion where district "was presented with 'an elusive
international defendant, striving to evade service'" (quoting *Rio Props., Inc.*, 284 F.3d at 1016)).
No such facts have been presented here.

order where plaintiffs did not allege that defendant "is attempting to evade service"), *aff'd*, 383 F. App'x 380 (5th Cir. 2010).  The SEC has made no showing that the ordinary methods of service on Khan would not be, or have not been, effective.

The cases relied upon by the SEC in support of its request for alternate service are inapposite.  (*See* SEC's Memo. of Law in Support of TRO at 20.)  For example, *SEC v. Unifund SAL*, 910 F.2d 1028, 1033-34 (2d Cir. 1990) involved service under a predecessor of Rule 4(f)(3), which included materially different language than the current rule.  *SEC v. Babikian*, No. 14-1740, 2014 WL 2069348, at *1 (S.D.N.Y. Apr. 21, 2014) did not even address the issue but, instead, merely referred to an order authorizing alternate service.  In *FTC v. Pecon Software Ltd.*, the plaintiff unsuccessfully attempted service through the Hague Convention before seeking an order pursuant to Rule 4(f)(3).  Nos. 12-7186, 12-7188, 12-7191, 12-7192, 12-7195, 2013 WL 4016272, at *1-4 (S.D.N.Y. Aug. 7, 2013).  Similarly, in *SEC v. Dubovoy*, this Court reasoned that, although the defendants resided in Russia and Russia was a signatory to the Hague Convention, Russia had "unilaterally suspended all judicial cooperation with the United States in civil and commercial matters in July 2003."  No. 15-6076, 2016 WL 7217607, at *2 (D.N.J. Dec. 13, 2016).  Because service through ordinary channels would "almost undoubtedly fail," this Court authorized alternate service.  *Id.*  In contrast, here, the SEC has made no such showing that service on Khan in Dubai pursuant to the ordinary channels would be futile.  Thus, the cases cited by the SEC do not support the entitlement to a Rule 4(f)(3) order, and before the SEC was entitled to such an order, it was required to make a showing that service through ordinary channels would be futile or that Khan has is actively trying to evade service.

As alleged in the Complaint, Khan resides in Dubai, UAE.  (Compl. at ¶ 30.)  The UAE is not a signatory to the Hague Convention, and there is no other agreement concerning service

of process between the UAE and the United States.  (*See* May 19, 2017 Letter with attachments from Samir Kanaan to Michael Weinstein ("Kanaan Letter") at ¶ 3, attached as **Exhibit B** to the Weinstein Cert.)  *See also Hassen v. Nahyan*, No. 09-1106, 2010 WL 9538408, at *14 (C.D. Cal. Sept. 17, 2010); *Orsi*, 2012 WL 4469120, at *2; *Smallwood v. Allied Pickfords, LLC*, No. 08-2196, 2009 WL 3247180, at *12 (S.D. Cal. Sept. 29, 2009), *aff'd sub nom.*, *Smallwood v. Allied Van Lines, Inc.*, 660 F.3d 1115 (9th Cir. 2011).  Under UAE law, service of process on foreign individuals must be carried out through diplomatic channels and effectuated through the ordinary methods of service for domestic UAE proceedings.  (Kannan Letter at ¶¶ 4, 5.)  Those ordinary service methods require litigants to first attempt personal service before resorting to alternative forms of notice, such as email.  (*Id.* at ¶ 10.)

Several courts to have considered the issue of a Rule 4(f)(3) order in the context of a defendant living in the UAE have ruled that, before alternate service would be authorized, the plaintiff must first attempt to effect service "in ways that would do less violence to UAE law." *Orsi*, 2012 WL 4469120, at *3 ("The Advisory Committee Notes to Rule 4 caution that, when considering alternative means of service, 'an earnest effort should be made to devise a method of communication that is consistent with due process *and minimizes offense to foreign law.*'" (quoting (with emphasis) Fed. R. Civ. P. 4, advisory committee note)); *see also Hassen*, 2010 WL 9538408, at *14 (alternative service was authorized after the plaintiff had hired a process server in the UAE that he had previously used with success but that the process server was unable to serve the defendant).  Specifically, the plaintiff must demonstrate "serious effort[s] to use accepted methods of service in the UAE," pursuant to Rule 4(f)(2)(A), before resorting to alternative methods of service under Rule 4(f)(3).  *Orsi*, 2012 WL 4469120, at *3.

Here, because the SEC has made no attempt to serve Khan personally or through the ordinarily diplomatic channels and has made no showing that efforts to comply with UAE's service procedures would be futile, the SEC's reliance upon Rule 4(f)(3) for alternative service was improper.  *See Orsi*, 2012 WL 4469120, at *4 (requiring "a stronger showing that service under UAE law or other means more respectful of the foreign jurisdiction, such as the letter rogatory process, is unavailable or at least prohibitively impractical" before alternative service would be authorized).  Thus, the SEC has not properly served Khan, and its failure to do so is fatal to the Court's personal jurisdiction over Khan.

Moreover, the SEC has inexplicably failed to fulfill its prior representation to the Court that it would attempt proper service, notwithstanding the Rule 4(f)(3) order.  In its application for a Rule 4(f)(3) order, the SEC represented that it would "make every effort to serve the Defendants personally under Rule 4(f) once their personal identity is discovered."  (SEC's Memo. of Law in Support of TRO at 20.)  In spite of this representation, the SEC has made absolutely no effort to personally serve Khan.

For these reasons, the SEC did not make the required showing of need for court intervention, and, as a result, it was not entitled to a Rule 4(f)(3) order.  The SEC cannot meet its burden of demonstrating proper service on Khan, and the Complaint against him must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(5).

### V.   THE COURT SHOULD DISSOLVE THE PORTION OF THE TRO FREEZING KHAN'S FUNDS AT RJO LTD.

Pursuant to Fed. R. Civ. P. 65(b)(2), a temporary restraining order expires "at the time after entry -- ***not to exceed 14 days*** -- that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension." (emphasis added).  In other words, unless one of the two exceptions enumerated in Fed. R. Civ.

P. 65(b)(2) is satisfied, a temporary restraining order automatically expires fourteen days after entry.  *See, e.g.*, *Curto v. A Country Place Condo. Assoc., Inc.*, No. 16-5928, 2016 WL 6434103, at *1 (D.N.J. Oct. 28, 2016) ("Under Rule 65, unless a temporary restraining order is extended, it expires no later than fourteen days after the date of [entry]."); *Ingris v. Bank of Am.*, No. 14-3726, 2015 WL 226000, at *2 (D.N.J. Jan. 16, 2015) (same); *see also Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 440 (1974) (stating that an *ex parte* temporary restraining order does not remain in force longer than the time limits of Rule 65(b)).

Here, it is beyond dispute that the TRO -- entered on February 24, 2017 -- has been in effect far longer than the fourteen days permitted under Fed. R. Civ. P. 65.  Moreover, neither of the exceptions enumerated in Fed. R. Civ. P. 65(b)(2) is satisfied with respect to Khan.  First, the Court has not extended the TRO "for good cause" as to Khan.  Even if the TRO was extended for good cause as to Khan (which it was not), such an extension may not exceed fourteen additional days, *i.e.*, twenty-eight days from the date of entry.  *See, e.g.*, *Globus Med., Inc. v. Vortex Spine, LLC*, 605 F. App'x 126, 128-29 (3d Cir. 2015) (stating that temporary restraining order "expire[s] after fourteen days unless the district court for good cause extended it for a like period and entered the reasons for the extension in the record").  Thus, any extension of the TRO for "good cause" would nevertheless have expired twenty-eight days after entry, or on March 24, 2017.

Second, Khan did not consent to any extension of the TRO.  While it appears that other parties submitted a consent order to extend the TRO (*see* Consent Order), Khan was not a party to that consent order, nor would he have consented to an extension.  Khan's lack of consent is further evidenced by the SEC's March 3, 2017 letter requesting a postponement of the

preliminary injunction hearing which specifically noted that **only** Greenberg Traurig's and Willkie Farr's clients consented to an extension of the TRO for a "reasonable time." (*See* dkt. entry no. 5 (SEC's 3/3/17 Letter).)

Because the TRO has expired of its own accord and Khan did not consent to any extension thereto, the TRO must be dissolved as to Khan. To hold otherwise would essentially convert the ***Temporary*** Restraining Order into an injunction.

## <u>CONCLUSION</u>

For all the foregoing reasons, Khan's motion to dismiss the Complaint should be granted

and the Court should issue an order unfreezing Khan's assets.

Respectfully submitted,

COLE SCHOTZ P.C.
Attorneys for Defendant, Muhammad
Ammar Khan

By:   */s/ Michael Weinstein*
      Michael Weinstein

DATED:  May 19, 2017

40