**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>               Plaintiff,<br><br>v.<br><br>ONE OR MORE UNKNOWN TRADERS IN THE SECURITIES OF FORTRESS INVESTMENT GROUP, LLC, et al.,<br><br>               Defendants. | Civil Action No.: 2:17-cv-01287<br><br>**OPINION** |

**CECCHI, District Judge.**

## I.  INTRODUCTION

This matter comes before the Court upon the following three motions: (1) Defendant Muhammad Ammar Khan's ("Khan") motion to dismiss the United States Securities and Exchange Commission's (the "SEC") first amended complaint ("FAC") and for an order unfreezing assets (ECF No. 36); (2) Defendants David Isaac Ettedgui ("Ettedgui"), Creative Empire Global Limited ("Creative"), Nacim Ould Kaddour ("Kaddour"), and Lotus Trading SAL Holding's ("Lotus," and collectively with Ettedgui, Creative, and Kaddour, the "ECKL Defendants") motion to dismiss the SEC's FAC (ECF No. 43); and (3) Defendants Kashif Qadri ("Qadri"), Alda Ltd. ("Alda"), Chaudhry Muhammad Zeeshan ("Zeeshan"), and Endeso Ltd.'s ("Endeso," and collectively with Qadri, Alda, and Zeeshan, the "QAZE Defendants") motion to dismiss the SEC's FAC.[1]  (ECF No. 45).  The motions are opposed by the SEC.  (ECF No. 53). The motions are decided without oral argument pursuant to Rule 78(b) of the Federal Rules of

---

[1] Khan, the ECKL Defendants, and the QAZE Defendants shall be referred to collectively as "Defendants."  Defendants Anthony Gary Dark ("Dark") and David Morris Kelly ("Kelly") neither filed notices of appearance nor motions to dismiss in this matter.  Defendant Jeffrey Robert Lewis was terminated from this matter on September 11, 2017.  (ECF No. 61).

Civil Procedure. For the reasons set forth below, Defendants' motions are granted in part and denied in part. Moreover, the SEC's FAC is dismissed without prejudice.

## II.   **BACKGROUND**

On April 28, 2017, the SEC filed its FAC with this Court, alleging that "[t]his is an insider trading case involving the purchase and sale of the securities of Fortress Investment Group LLC ("Fortress"), a company headquartered in New York whose shares of common stock are traded on the New York Stock Exchange ("NYSE")." (ECF No. 27 ("FAC") ¶ 1). The SEC further states that "Fortress is an investment management firm that services institutional and individual investors." (*Id.*).

The SEC contends that at the core of this litigation "is the announcement of Fortress's acquisition by SoftBank Group Corp. ("SoftBank")." (*Id.* ¶ 2). More specifically:

> After the U.S. markets closed on Tuesday, February 14, 2017, Japan-based Softbank announced that it had entered into a definitive merger agreement to acquire Fortress for approximately $3.3 billion in cash ("the Announcement"). According to the Announcement, Fortress shareholders would receive $8.08 per share, which represented a premium of 30% over Fortress's February 14th closing price of $6.21.

(*Id.*). The SEC maintains that "[i]n the days preceding the Announcement, Defendants, who are foreign traders trading through foreign accounts, amassed large, speculative positions in Fortress stock through derivative securities known as contracts for difference ("CFD") and spread bets." (*Id.* ¶ 3). The SEC describes CFDs and spread bets as follows:

> Both CFDs and spread bets allow traders to speculate in the movement of an equity security on margin and thus require only a small outlay of cash to take large positions betting on the movement of the underlying security. However, if the underlying security moves in the direction opposite to the position taken by the CFD or spread bet trader, the trader must have sufficient funds to pay the entire amount of the losses on the bet.

(*Id.*). According to the SEC, "Defendants purchased Fortress CFDs and/or and made spread bets on Fortress stock through foreign brokerage firms" and such foreign brokerage firms "hedged

their exposure by (i) purchasing Fortress shares on the NYSE through domestic brokerage firms; or (ii) purchasing CFDs or placing orders for Fortress shares through other foreign brokerage firms, which in turn purchased Fortress shares on the NYSE through domestic brokerage firms." (*Id.* ¶ 4). The SEC further purports that "Defendants took 'long' positions in Fortress through their CFD trading and/or spread bets, meaning that their investments in these derivative securities had the potential to appreciate substantially if there was a sudden upward movement of Fortress's stock price." (*Id.* ¶ 5).

The SEC maintains that the February 14, 2017 "Announcement was made the day that (or, in some cases, a day or two after) Defendants made their purchases." (*Id.* ¶ 6). More specifically, the SEC contends that Khan's purchases of CFDs referencing 400,000 shares of Fortress stock were made between February 10, 2017 and February 14, 2017, (*id.* ¶ 94); Creative's purchases of CFDs referencing 800,000 shares of Fortress stock (through Ettedgui) were made on February 14, 2017, (*id.* ¶¶ 64, 69); Lotus's purchases of CFDs and/or spread bets referencing 500,000 shares of Fortress stock (through Kaddour) were made on February 14, 2017, (*id.* ¶ 82); Alda's purchases of CFDs referencing 150,000 shares of Fortress stock (through Qadri) were made on February 14, 2017, (*id.* ¶ 58); and Endeso's purchases of CFDs referencing 100,000 shares of Fortress stock (through Zeeshan) were made on February 14, 2017. (*Id.* ¶ 76).

For each of Defendants' purchases, the SEC contends that various brokerage firms hedged their exposure on Defendants' CFD trades and/or spread bets by either making corresponding trades in Fortress securities through other brokerage firms that thereafter traded an equal amount of CFDs/spread bets on the NYSE, or by directly trading an equal amount of CFDs/spread bets on the NYSE. (*Id.* ¶¶ 61, 67, 72, 79, 85, 96).

Further, the SEC alleges that:

> As a result of the Announcement, Fortress's share price increased substantially, from a close of $6.21 on February 14th to a close of $7.99 on February 15th. The purchases of Fortress shares on the NYSE that resulted from Defendants' February 14, 201[7] CFD purchases and spread bets comprised a suspiciously high percentage of the total trading volume of Fortress stock on that day, nearly 20%. The Announcement also caused a dramatic rise in Fortress's trading volume, which increased by 1,672% from February 14th (8,547,319 shares traded) to February 15th (151,447,966 shares traded).

(*Id.* ¶ 6). After the Announcement, the SEC maintains that "Defendants promptly closed their CFD and spread bet positions on February 15, 2017, for profits in excess of $3.8 million." (*Id.* ¶ 7). More specifically, the SEC contends that Khan reaped $753,351.81 in gross profit, (*id.* ¶ 97); Creative (through Ettedgui) reaped over $1.4 million in gross profit, (*id.* ¶ 74); Lotus (through Kaddour) reaped $853,520.37 in gross profit, (*id.* ¶ 86); Alda (through Qadri) reaped $281,083.50 in gross profit, (*id.* ¶ 62); and Endeso (through Zeeshan) reaped $185,919.54 in gross profit. (*Id.* ¶ 80).

According to the SEC, "[t]he timing, size and profitability of Defendants' Fortress trades are highly suspicious" because discussions about the SoftBank acquisition of Fortress began in December 2016, and the acquisition "was initially expected to be finalized over the weekend of February 10-12, 2017." (*Id.* ¶ 8). As the SEC explains:

> Fortress's board had been tentatively scheduled to approve the transaction on February 12th. However, due to several unresolved issues, the transaction was not considered by Fortress's board on February 12th and the consummation of the deal was in serious doubt at that time . . . . Then, at 5:45 p.m. on February 13th (i.e., after trading closed that day), Fortress's board received notice of a February 14th meeting regarding the acquisition. On February 14th, Fortress's board of directors received an email at 11:02 am that included draft resolutions approving the transaction. The remaining Defendants[2] began purchasing Fortress CFDs and[/]or making spread bets in the hours following this email.

(*Id.*).

---

[2] The SEC does not include Khan in the "remaining Defendants" because Khan allegedly began purchasing Fortress CFDs on February 10, 2017. (FAC ¶ 94).

The SEC further maintains that "[t]he confidential information about the Fortress acquisition was closely held, and both Fortress and SoftBank took all reasonable steps to maintain the confidentiality of that information," including implementing confidentiality agreements with employees, maintaining general and specific insider trading compliance policies with employees, entering into confidentiality agreements with potential business partners, using a code name to describe the acquisition, limiting the dissemination of information about the acquisition, and implementing systems to prevent insider trading. (*Id.* ¶¶ 9, 42-54).

Moreover, the SEC contends that "the pool of potential tippers in this case is limited" to "Board members, officers[,] and certain 'need to know' employees within Fortress and SoftBank, as well as the partners, investment bankers, attorneys, accountants and public relations firms engaged by those two entities." (*Id.* ¶ 9).[3]

The SEC's main contention is that:

> Upon information and belief, tipper(s) from this pool provided this highly confidential information to Defendants in breach of a fiduciary duty to the companies involved, or another individual misappropriated the information from an individual in the pool in violation of a fiduciary duty to an insider. Defendants were thus tipped material, nonpublic information about SoftBank's impending acquisition of Fortress in advance of their trading in Fortress CFDs and spread bets. Upon information and belief, Defendants made their purchases of Fortress stock based on this material, nonpublic information.

(*Id.* ¶ 10; *see also id.* ¶¶ 63, 75, 81, 87, 98). In further support of the SEC's contention, the SEC maintains that "[t]his is not the first or last time that Defendants have benefited from such perfect timing" as "overlapping groups of Defendants, trading in parallel, have engaged in repeated,

---

[3] For Fortress, the SEC indicates that "the pool" includes certain employees of: Morgan Stanley; Davis Polk & Wardwell LLP; Legance; Maples and Calder; Paul, Weiss, Rifkind, Wharton & Garrison LLP; Evercore Group, LLC; Debevois & Plimpton LLP; Gasthalter & Co.; Ernst & Young LLP; Skadden Arps Slate Meagher & Flom LLP; and Willkie Farr & Gallagher, and for SoftBank, certain employees of J.P. Morgan Securities LLC; F.A.B. Partners; Kirkland & Ellis LLP; KPMG, LLP; Linklaters LLP; Mizuho Securities; Sard Verbinnen & Co.; Morrison & Foerster LLP; and Weil, Gotshal & Manges LLP. (FAC ¶ 9).

highly suspicious patterns of buying securities shortly prior to a major corporate announcement and then selling shortly thereafter for an enormous profit." (*Id.* ¶ 11; *see also id.* ¶¶ 111-212).[4]

## III.   LEGAL STANDARD

### A.   Motions to Dismiss

#### 1.   Rule 12(b)(2)

In deciding a motion to dismiss for lack of personal jurisdiction, a court must assume the allegations of the complaint are true. *See Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996). To assert personal jurisdiction over a nonresident defendant, the plaintiff has the burden to establish the defendant had sufficient minimum contacts with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citations omitted).

Personal jurisdiction arises when a defendant "purposefully avails [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). In other words, the defendant must have engaged in some purposeful conduct within the forum "such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980). To demonstrate such conduct, "the plaintiff must establish either that the particular cause of action sued upon arose from the defendant's activities within the forum state ('specific jurisdiction') or that the defendant has 'continuous and systematic' contact with forum state ('general jurisdiction')." *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434,

---

[4] On November 29, 2017, Magistrate Judge Mark Falk denied the ECKL Defendants' motion to strike the cited paragraphs of the SEC's FAC. (ECF No. 68). Accordingly, these paragraphs may be considered by the Court in rendering its Opinion on Defendants' motions.

437 (3d Cir. 1987) (quoting *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414, 416 (1984)).

"Where Congress has spoken by authorizing nationwide service of process, [however], as it has in the Securities Act, the jurisdiction of a federal court need not be confined by the defendant's contacts with the state in which the federal court sits." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002). "Following this reasoning, the district courts within this Circuit have repeatedly held that a 'national contacts analysis' is appropriate 'when appraising personal jurisdiction in a case arising under a federal statute that contains a nationwide service of process provision.'" *Id.* (citations omitted). Therefore, "a federal court's personal jurisdiction may be assessed on the basis of the defendant's national contacts when the plaintiff's claim rests on a federal statute authorizing nationwide service of process." *Id.*

### 2.      Rule 12(b)(5)

A party may move to dismiss for insufficient service of process under Federal Rule of Civil Procedure 12(b)(5). The party serving process bears the burden of establishing the validity of service. *See Jumpp v. Jerkins*, No. 08-6268, 2010 WL 715678, at *6 (D.N.J. Mar. 1, 2010) (citing *Grand Entm't Group, Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 488 (3d Cir. 1993)).

Service of process is governed by Rule 4 of the Federal Rules of Civil Procedure. Rule 4(f) states the requirements for serving an individual in a foreign country. Under Rule 4(f):

> Unless federal law provides otherwise, an individual—other than a minor, an incompetent person, or a person whose waiver has been filed—may be served at a place not within any judicial district of the United States:
>
> (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;
>
> (2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:

7

(A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;

(B) as the foreign authority directs in response to a letter rogatory or letter of request; or

(C) unless prohibited by the foreign country's law, by:

(i) delivering a copy of the summons and of the complaint to the individual personally; or

(ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or

(3) by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f).

### 3.    Rule 12(b)(6)

For a complaint to survive dismissal pursuant to Fed. R. Civ. P. 12(b)(6), it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a complaint, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Furthermore, "[a] pleading that offers 'labels and conclusions' . . . 'will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations omitted).

"Claims pursuant to § 10(b) and Rule 10b-5, including insider trading claims, are subject to heightened pleading standards under Rule 9(b), which requires a party to 'state with particularity the circumstances constituting fraud.'" *SEC v. Cooperman*, 243 F. Supp. 3d 597,

8

601 (E.D. Pa. 2017) (quoting Fed. R. Civ. P. 9(b)) (citing *Key Equity Inv'rs, Inc. v. Sel-Leb Mktg. Inc.*, 246 F. App'x 780, 784 (3d Cir. 2007)). "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue." *Id.* at 601-02 (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)).

### B.    Injunctions and Restraining Orders

"A temporary restraining order is a 'stay put,' equitable remedy that has as its essential purpose the preservation of the status quo while the merits of the cause are explored through litigation." *Ctr. for Wound Healing v. Toomey*, No. 09-3149, 2009 WL 2246102, at *3 (E.D. Pa. July 24, 2009) (citations omitted). Federal Rule of Civil Procedure 65(b)(2) states that:

> Every temporary restraining order . . . . expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.

Fed. R. Civ. P. 65(b)(2).

## IV.    DISCUSSION

### A.    Defendants' Motions to Dismiss

Currently before the Court are three motions to dismiss, one filed by Khan, (ECF No. 36), one filed by the ECKL Defendants, (ECF No. 43), and one filed by the QAZE Defendants. (ECF No. 45). The Court will address each argument presented in Defendants' motions.

#### 1.    Rule 12(b)(2)

Khan and the QAZE Defendants argue that the Court should dismiss the FAC for lack of personal jurisdiction over Khan, Qadri, and Zeeshan. (ECF Nos. 36-1 at 28; 46 at 15). Khan, a Pakistani national living in Dubai, argues that he "does not have the requisite contacts with the

9

United States sufficient for either general or specific personal jurisdiction." (ECF No. 36-1 at 29). Moreover, Khan contends that his "trades in the Fortress CFDs, from Dubai, with RJO Ltd., in London, do not establish the requisite 'minimum contacts' for personal jurisdiction." (*Id.* at 30).

Qadri, a Danish national, and Zeeshan, a Dutch national, both living in the United Arab Emirates, maintain that "[t]he SEC cannot plausibly contend, nor does it allege, that Qadri or Zeeshan is subject to the general jurisdiction of this Court." (ECF No. 46 at 18). Further, Qadri and Zeeshan argue that all of their "transactions took place outside the United States" and therefore the Court does not have specific jurisdiction over Qadri and Zeeshan. (*Id.* at 18-19). The SEC, however, maintains that the Court has personal jurisdiction over Khan, Qadri, and Zeeshan as a result of their foreign CFD trades. (ECF No. 53 at 44-45).

"The due process test for personal jurisdiction has two related components: the minimum contacts inquiry and the reasonableness inquiry." *SEC v. Maillard*, No. 13-5299, 2014 WL 1660024, at *1 (S.D.N.Y. Apr. 23, 2014) (citations omitted).

> "Where a defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws,' it submits to the judicial power of an otherwise foreign sovereign to the extent that power is exercised in connection with the defendant's activities touching on the State."

> "Purchasers of CFDs specifically target their investments at the U.S. market, as they receive the benefit or loss of any price changes on the domestic exchange, the dividends paid on the underlying shares, and sometimes receive voting rights. Indeed, CFDs provide foreign investors with a way to access American exchange-traded securities without opening U.S. brokerage accounts."

*Id.* (citations omitted).

Here, the SEC offers sufficient support for the Court to conclude that Kahn, Qadri, and Zeeshan are sophisticated investors who understood that their purchases and sales of CFDs triggered corresponding purchases and sales by their brokerage firms on the NYSE. First, this

was not the first time that Khan, Qadri, and Zeeshan traded CFDs. (ECF No. 55 ¶¶ 15, 24, 34; *see also* ECF No. 57 at 10 ("Khan is 'an experienced CFD trader.'")).[5] Second, Khan, Qadri, and Zeeshan's "Fortress CFD trades were executed in U.S. dollars with reference to the price of the shares of Fortress that were traded on U.S. exchanges." (ECF No. 55 ¶¶ 14, 23, 33). Third, Khan, Qadri, and Zeeshan's "orders were based on a percentage of the volume of Fortress shares trading in the United States and/or via limit orders based on the price of Fortress shares," and their "orders changed over time based on [their brokerage firms'] ability to fill them in U.S. markets." (*Id.* ¶¶ 19, 28; *see also id.* ¶ 38).

Based on the foregoing, the Court finds that Khan, Qadri, and Zeeshan "knowingly availed [themselves] of the market in New York, thereby taking advantage of all of the investor protections that are imposed on that exchange and its participants by the U.S. securities laws." *Maillard*, 2014 WL 1660024, at *2. Khan, Qadri, and Zeeshan therefore "had sufficient contact with New York for the Court to exercise specific personal jurisdiction, and it is reasonable for the Court to do so." *Id.*; *see also SEC v. Compania Internacional Financiera S.A.*, No. 11-4904, 2011 WL 3251813, at *5 (S.D.N.Y. July 29, 2011) (finding that where the SEC alleged that foreign traders in CFDs made purchases and sales on the basis of insider information, the "alleged insider trading . . . provide[d] the minimum contacts and reasonableness necessary for personal jurisdiction").[6] As such, Khan and the QAZE Defendants' 12(b)(2) motions are denied.

---

[5] The Court notes that the SEC may submit evidence outside the FAC to respond to Khan, Qadri, and Zeeshan's claim that the Court lacks personal jurisdiction, the submission of which does not transform their motions to dismiss into motions for summary judgment. *See Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984) ("A Rule 12(b)(2) motion . . . is inherently a matter which requires resolution of factual issues outside the pleadings . . . . Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence.").

[6] Although Qadri and Zeeshan contend that they do not have sufficient contacts with *New Jersey* to establish personal jurisdiction, (ECF No. 46 at 19-20), the relevant question in a securities

11

### 2.  Rule 12(b)(5)

Khan also argues that the Court should dismiss the FAC as against Khan for insufficient service of process. (ECF No. 36-1 at 32-37). More specifically, Khan contends that the Court erred in granting the SEC permission to effectuate service under Rule 4(f)(3) for three reasons. First, Khan contends that the SEC "was [initially] required to make a showing that service through ordinary channels would be futile or that Kahn . . . is actively trying to evade service." (*Id.* at 35). Second, Khan maintains that because Khan resides in the United Arab Emirates, the SEC was required "to first attempt personal service before resorting to alternative forms of notice, such as email." (*Id.* at 36). Third, Khan argues that "the SEC has inexplicably failed to fulfill its prior representation to the Court that it would attempt proper service, notwithstanding the Rule 4(f)(3) order." (*Id.* at 37). The SEC, conversely, maintains that the Court properly granted the SEC permission to effectuate service under Rule 4(f)(3). (ECF No. 53 at 50-57).

The Court finds that the SEC was not required to make a showing that service through ordinary channels would be futile or that Kahn was actively trying to evade service to be granted permission to effectuate service under Rule 4(b)(3). As Khan concedes, all that the SEC needed to show was that "facts and circumstances . . . necessitat[ed] the district court's intervention." (ECF No. 36-1 at 34 n.5) (citations omitted). Indeed, "[c]ourts can grant Rule 4(f)(3) requests even where a plaintiff does not show that the other means are unduly burdensome or impossible." *Bravetti v. Liu*, No. 12-7492, 2013 WL 6501740, at *3 (D.N.J. Dec. 11, 2013). A court's decision to grant a Rule 4(f)(3) request, moreover, is discretionary. *See SEC v. Dubovoy*, No. 15-6076, 2016 WL 7217607, at *2 (D.N.J. Dec. 13, 2016). Here, the Court determined that:

> [T]he Commission will encounter undue delay serving the Defendants through
> means agreed upon by the Hague Convention or authorized under the Federal

---

case is whether Qadri and Zeeshan have sufficient contacts with the *United States. See Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002); *see also supra* Part III.A.1.

> Rules of Civil Procedure, and it is, thus, appropriate to authorize service by alternative means that comports with constitutional notions of due process. The alternative means of service proposed by the Commission (i.e., via Defendants' brokers and other agents with whom they have regular contact) are reasonably calculated, under all the circumstances, to apprise the Defendants of the pendency of the action and afford them an opportunity to present their objections.

(ECF No. 3 ¶ 8). The Court acknowledged that the SEC was moving quickly with its claims against Defendants, and determined that the most efficient way to notify Defendants of such claims was through Rule 4(f)(3) service. Accordingly, Khan's argument is without merit.

Additionally, the SEC was not required to first attempt personal service on Kahn solely because Khan is a resident of the United Arab Emirates. "Rule 4 provides that a defendant in a foreign country may be served 'by other means not prohibited by international agreement, as the court orders.'" *Hassen v. Nahyan*, No. 09-1106, 2010 WL 9538408, at *14 (C.D. Cal. Sept. 17, 2010) (citing Fed. R. Civ. P. 4(f)(3)). As Khan concedes, "there is no . . . agreement concerning service of process between the [United Arab Emirates] and the United States." (ECF No. 36-1 at 35-36). Accordingly, Khan's argument is without merit.

Finally, the Court recognizes that the SEC stated in its application for a temporary restraining order that it would "make every effort to serve the Defendants personally under Rule 4(f) once their personal identit[ies were] discovered," (ECF No. 2-1 at 20), and that Khan maintains that "the SEC has made absolutely no effort to personally serve Khan." (ECF No. 36-1 at 37). Nonetheless, the Court does not find that the SEC's representation constitutes a basis to invalidate lawful service of process on Khan. Accordingly, the Court finds that Khan was served properly under the Federal Rules of Civil Procedure and his 12(b)(5) motion is denied.

### 3.    Rule 12(b)(6)

Defendants' motions to dismiss the SEC's FAC under Rule 12(b)(6) contend that the SEC fails to state a claim upon which relief may be granted because: (1) the SEC fails to plead

the necessary elements for an insider trading claim and (2) CFDs do not constitute securities under the Securities Exchange Act. Each of Defendants' arguments will be addressed in turn.

### a.    Insider Trading

The SEC's "claims against Defendants are brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 thereunder." (ECF No. 53 at 23). "Section 10(b) proscribes the 'use or employ[ment], in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.'" *In re PDI Sec. Litig.*, No. 02-0211, 2005 WL 2009892, at *8 (D.N.J. Aug. 17, 2005) (alteration in original) (citing 15 U.S.C. § 78j(b)). Rule 10b-5 makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . [t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

"The Supreme Court has recognized two complementary theories of insider trading liability under § 10(b) and Rule 10b-5: the 'traditional' and 'misappropriation' theories." *United States v. McGee*, 763 F.3d 304, 310 (3d Cir. 2014). "Traditional insider trading occurs 'when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information.'" *Id.* (citations omitted). "In contrast, misappropriation focuses on deceptive trading by outsiders who owe no duty to shareholders." *Id.* at 311.

"The classical and misappropriation theories extend liability to tippers who share inside information with another person for trading purposes, and to tippees who trade on the information." *SEC v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc. (Onyx I)*, 296 F.R.D. 241, 249 (S.D.N.Y. 2013). "A tipper is liable for insider trading if she has a duty to keep

14

material nonpublic information confidential, she tips someone who could use the information in connection with securities trading, and she personally benefits from giving the tip." *Id.* "A tippee's liability is derivative of a tipper's liability; absent a breach of duty by the tipper, there can be no derivative breach by the tippee." *Id.* at 250. "A tippee incurs liability for a tipper's breach if he knows or has reason to know that the tip was passed on in violation of a fiduciary duty, and he knows that the tip is material nonpublic information, but he nevertheless trades on the information or tips the information for his own personal benefit." *Id.* "[T]he requisite state of mind for all the foregoing theories of liability is scienter." *Id.* "Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Id.* (citations omitted).

There are two principal factual allegations in the SEC's FAC. First, there existed material, nonpublic information to be tipped. SoftBank's acquisition of Fortress would undoubtedly affect Fortress's stock price and both SoftBank and Fortress took significant steps to keep their discussions confidential. (FAC ¶¶ 42-54). Indeed, on the day before the Announcement, Fortress stock closed at $6.21 per share, and the day of the Announcement, Fortress stock closed at $7.99 per share. (*Id.* ¶ 57).

Second, Defendants purchased CFDs and spread bets between February 10, 2017 and February 14, 2017, which were subsequently hedged by brokerage firms trading in Fortress securities. (*Id.* ¶¶ 58-59, 61, 64-65, 67, 69-70, 72, 76-77, 79, 82-83, 85, 94, 96). Further, Defendants sold their CFDs and spread bets on Febraury 15, 2017, from which they reaped various profits. (*Id.* ¶¶ 60, 62, 66, 68, 71, 73-74, 78, 80, 84, 86, 95, 97).

Based on these two factual allegations, the SEC contends that it has sufficiently pled the elements of tippee liability. The Court disagrees. The FAC alleges that:

> Upon information and belief, at the time the Defendants purchased Fortress securities as set forth above, they were in possession of material, nonpublic

15

> information about the confidential discussions surrounding SoftBank's impending acquisition of Fortress. The Defendants (a) knew, recklessly disregarded, or should have known that their trading was in breach of a fiduciary duty or similar duty of trust and confidence owed to the shareholders of Fortress, or to the source from whom they received the material, nonpublic information; and/or (b) knew, recklessly disregarded, or should have known that the material, nonpublic information concerning the impending acquisition had been communicated to them was disclosed or misappropriated in breach of a fiduciary duty or similar duty of trust and confidence.
>
> Upon information and belief, any and all material nonpublic information that the Defendants received concerning Fortress as set forth above, was disclosed in exchange for a personal benefit that benefited the communicator of such information.

(FAC ¶¶ 214-15; *see also id.* ¶¶ 63, 75, 81, 87, 98 (alleging that "[u]pon information and belief, [Defendants were] tipped and [were] in possession of material, nonpublic information about Softbank's offer to acquire Fortress at a substantial premium over the stock price at the time [Defendants] made the . . . purchases alleged in [the FAC]")).

As in *Onyx I,* "[t]hese allegations are all belief and no information. Unless such beliefs can be reasonably inferred from the well-pleaded factual allegations, they amount to a 'threadbare recital[]' of the elements of tippee liability that does nothing to nudge the SEC's claim 'across the line from conceivable to plausible.'" 296 F.R.D. at 251 (quoting *Iqbal,* 556 U.S. at 678, 680).

Nonetheless:

> [B]ecause insider tips are typically passed on in secret, it is often impractical to require plaintiffs to allege these details with particularity. Instead, Rule 9(b) may be relaxed to allow a plaintiff to plead facts that imply the content and circumstances of an insider tip. This relaxation should not completely eliminate the rigors of Rule 9(b) . . . . Rule 9(b) is therefore relaxed only to the following extent: if a tip took place under circumstances known only to the defendant and the tipper, the plaintiff may plead a belief about the content and the circumstances of the tip, coupled with particular facts supporting that belief.

*Id.* at 248.

The SEC argues that the FAC survives dismissal under this relaxed standard because the SEC alleges that the trades were "highly suspicious" based on their "timing, size and profitability." (FAC ¶ 8). As a preliminary matter, the Court notes that it is not "bound to accept the SEC's characterization of these trades as . . . 'highly suspicious.'" *Onyx I*, 296 F.R.D. at 251. "Calling these trades highly suspicious is tantamount to saying that the trades strongly support an inference of insider trading—that is a legal conclusion, not a fact, and it is a conclusion that is not supported by facts alleged in the [FAC]." *Id.* "Some of these circumstances[, however,] do raise mild suspicion . . . . [T]he timing and profitability of the trades raise suspicion in tandem— one circumstance is not suspicious without the other—and together, they do have the potential to raise 'high suspicion' in conjunction with other circumstances." *Id.*

One of these circumstances, the SEC contends, is Defendants' "suspicious trading" of *other* securities. (FAC ¶¶ 11, 111-212; ECF No. 53 at 30 ("Defendants traded very fortuitously in at least five stocks . . . in just the four months between November 2016 and February 2017. Such 'highly suspicious timing supports a reasonable inference that [Defendants'] purchases were more than' fortuitous.") (quoting Order, *SEC v. Condroyer*, et al., No. 09-3600 (N.D. Ga. Sept. 28, 2011), ECF No. 38); *id.* at 34). *SEC v. Condroyer*, however, held that "the highly suspicious timing [of defendant's purchases at issue in that matter] support[ed] a reasonable inference that [defendant's] purchases were more than [fortuitous]." Order, *SEC v. Condroyer*, et al., No. 09-3600 (N.D. Ga. Sept. 28, 2011), ECF No. 38 at 19. Although courts "have held that circumstantial evidence such as suspicious timing of trades, contacts between potential tippers and tippees, and incredible reasons for such trades provide an adequate basis for inferring that tipping activity has occurred," *SEC. v. Singer*, 786 F. Supp. 1158, 1164 (S.D.N.Y. 1992), the Court is unaware of any case where a defendant's purchases of stock *not at issue in that matter*,

17

standing alone, constituted sufficient circumstantial evidence of insider trading to survive a motion to dismiss.  Moreover, the Court does not find that the FAC presents other suspicious circumstances.

The size of Defendants' trades is not informative.  The SEC argues that "[t]he purchases of Fortress shares on the NYSE that resulted from Defendants' February 14, 201[7] CFD purchases and spread bets comprised a suspiciously high percentage of the total trading volume of Fortress stock on that day, nearly 20%." (FAC ¶ 6).  Nonetheless, the SEC does not allege coordinated trading in Fortress securities in the FAC, and it is therefore unclear why the SEC has aggregated Defendants' purchases.   Considering the size of each individual Defendant's purchases, the Court declines to find that, absent any other factual allegations, that Defendants' purchases were highly suspicious.  *Contra SEC v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc.*, No. 13-4645, 2014 WL 5026153, at *1 (S.D.N.Y. Sept. 29, 2014) (considering traders' purchases individually and concluding that traders' purchases of 78%, 42%, and 16% of the day's trading volume were "unusual"), *reconsideration denied sub nom. SEC v. Jafar*, No. 13-4645, 2015 WL 3604228 (S.D.N.Y. June 8, 2015).  Based on the foregoing, the Court concludes that Defendants' trades are at most mildly suspicious.

The SEC's other principal factual allegation—that there existed material, non-public information to be tipped—is "not enough to bridge the gap from possible to plausible tippee liability." *Onyx I*, 296 F.R.D. at 252.  The SEC has not identified "a 'limited' class or pool of tippers."  (ECF No. 53 at 30).  Further, the SEC's allegations fail to sufficiently imply that anyone tipped Defendants.

The SEC identifies "the pool of potential tippers in this case" as "Board members, officers[,] and certain 'need to know' employees within Fortress and SoftBank, as well as the

partners, investment bankers, attorneys, accountants[,] and public relations firms engaged by those two entities." (FAC ¶ 9). More specifically, the pool includes certain employees of Morgan Stanley; Davis Polk & Wardwell LLP; Legance; Maples and Calder; Paul, Weiss, Rifkind, Wharton & Garrison LLP; Evercore Group, LLC; Debevois & Plimpton LLP; Gasthalter & Co.; Ernst & Young LLP; Skadden Arps Slate Meagher & Flom LLP; Willkie Farr & Gallagher; J.P. Morgan Securities LLC; F.A.B. Partners; Kirkland & Ellis LLP; KPMG, LLP; Linklaters LLP; Mizuho Securities; Sard Verbinnen & Co.; Morrison & Foerster LLP; and Weil, Gotshal & Manges LLP. (*Id.*).

In response, Defendants maintain that the SEC has failed to plead a limited pool of potential tippers, as the SEC identified "employees of . . . *twenty* entities, many of which have an international presence and are amongst the largest players in their fields[.]" (ECF No. 36-1 at 16; *see also* ECF No. 43-1 at 13-14 ("[T]he Amended Complaint identifies a 'pool of potential tippers' that consists of *hundreds of thousands* of employees from some of the world's largest investment banks, law firms, accounting firms, and public relations firms.")). Although the Court does not opine on what "size pool" constitutes a limited pool of potential tippers, the Court cannot find that "[t]he SEC has . . . identified a person or a limited group of people who might have been the tipper" in this matter. *See Onyx I*, 296 F.R.D. at 252.

Further, the SEC neither contends that Defendants had a preexisting relationship with Fortress or Softbank from which one could infer that a tip had been given, nor identifies any contact between Defendants and an alleged tipper. The SEC also does not allege facts that suggest Defendants had knowledge of the events that took place before the Announcement. "In the absence of these allegations or any other allegations supporting a link between . . . Defendants and a tipper, the SEC has failed to meet the Rule 9(b) standard requiring

particularized facts[.]" *Id.* Accordingly, the SEC's argument that it has identified a limited pool of tippers fails.

The SEC has also failed to plead facts from which one could infer the requisite state of mind—scienter. The facts, as alleged, do not support an inference that a tip was given. Even if the facts did support an inference that a tip was given, however, the SEC fails to plead any facts that such a tip was made in violation of a fiduciary duty or that Defendants knew or should have known about that violation. Although the FAC contains factual allegations about the confidentiality of the Announcement and the efforts Fortress and SoftBank made to keep the Announcement secret, without more, the FAC does not survive dismissal.

> [T]he SEC asks the Court to infer that someone tipped . . . Defendants about the [Announcement,] and on that basis, to infer that the tipper was deceptively breaching a fiduciary duty, then on that basis, to infer that . . . Defendants knew or were reckless in not knowing that the tip (whatever its content) consisted of material nonpublic information, and that Defendants knew or should have known that the tipper (whoever she was) breached a fiduciary duty by passing on the tip. Piling inference upon inference in this way does not provide the requisite strong support for the inference that . . . Defendants acted with scienter.

*Id.* at 253 (citing *Turkish v. Kasenetz*, 27 F.3d 23, 28 (2d Cir. 1994); *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990), *denying reh'g*, 917 F.2d 98 (2d Cir. 1990)).

As such, the Court finds that:

> [T]he factual allegations in this case are insufficient to support a reasonable inference of insider trading. There is no indication that the SEC knows whether material nonpublic information was tipped, who did the tipping, or who received the tip. It is impossible to infer that . . . Defendants acted with a culpable state of mind in the absence of that information. "A complaint alleging fraud should be filed only after a wrong is reasonably believed to have occurred; it should serve to seek redress for a wrong, not to find one." This complaint appears to have been filed in search of a liable tippee.

*Id.* at 254 (quoting *Segal v. Gordon*, 467 F.2d 602, 607-08 (2d Cir. 1972)).   Accordingly,

Defendants' 12(b)(6) motions are granted in part.[7]

### b.   Contracts for Difference

In further support of his motion to dismiss, Khan argues that CFDs are neither securities,

nor do they satisfy the Securities Exchange Act's "in connection with" test.  (ECF No. 36-1 at

21-24).   Additionally, Khan and the QAZE Defendants contend that the Securities Exchange Act

does not apply extraterritorially to the foreign-based transactions at issue in the FAC.  (*Id.* at 24-

27; ECF No. 46 at 20-21).   In response, the SEC maintains that: (1) CFDs are securities; (2) even

if CFDs are not securities, CFDs meet the "in connection with" test; and (3) the Securities

Exchange Act applies extraterritorially to the transactions at issue.  (ECF No. 53 at 36-43).

In support of its contention that CFDs constitute securities, the SEC cites to *Freudenberg

v. E\*Trade Financial Corporation*, which held that "a CFD is a 'security' as that term is broadly

defined in the Securities Exchange Act of 1934[.]"  Nos. 07-8538, et al., 2008 WL 2876373, at

\*6 (S.D.N.Y. July 16, 2008); *see also In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 684 (D. Colo.

2014) ("[I]t is undisputed that CFDs qualify as securities."); *Compania*, 2011 WL 3251813, at \*3

("CFDs . . . constitute securities as defined by the federal securities laws.").   Although the Court

acknowledges the precedent provided by the SEC, the Court need not reach the issue of whether

the CFDs in this matter constitute securities because the CFDs at issue nonetheless meet the

Securities Exchange Act's "in connection with" test.

---

[7] Although Dark and Kelly did not file notices of appearances or motions to dismiss in this
matter, the Court finds that the SEC's claims suffer from the same deficiencies with respect to
both of these defendants.   Accordingly, the SEC's FAC will be dismissed in its entirety, as
against all of the defendants.  *See Ingris v. Drexler*, No. 14-2404, 2015 WL 1472657, at \*7
(D.N.J. Mar. 30, 2015) (finding that where plaintiff had an opportunity to respond to a number of
defendants' motions to dismiss, the Court could *sua sponte* dismiss plaintiff's claims as to a non-
moving defendant where the court's reasoning was based on an argument in such motions).

"Both Section 10(b) of the Exchange Act and the Securities Act define 'security' by enumerating the types of instruments that qualify and, in the case of Section 10(b), those that do not." *SEC v. Sabrdaran*, No. 14-4825, 2015 WL 901352, at *9 (N.D. Cal. Mar. 2, 2015). CFDs are not included in the list of enumerated instruments under either statute. Nonetheless, "the Supreme Court emphasized that the plain language of the Exchange Act only requires that a fraudulent scheme or device be 'in connection with' a securities transaction." *Id.* (quoting *SEC v. Zandford*, 535 U.S. 813, 819 (2002)). "[T]o meet this 'in connection with' standard, 'the securities transaction[] and breaches of fiduciary duty' merely must 'coincide.'" *Id.* (citations omitted). In other words, "the allegations of fraud merely must '"coincide" with the securities transaction' and be 'easily characterized as having "more than some tangential relation to" the securities themselves.'" *Id.* (citations omitted). "[T]he 'in connection with' test is 'as broad and flexible as is necessary to accomplish the statute's protective purposes[,]' and is met if the alleged fraud 'somehow touches upon' or has 'some nexus' with 'any securities transaction[.]'" *Id.* (citations omitted).

The SEC alleges that each Defendant acquired CFDs or spread bets referencing a particular number of shares of Fortress stock through various brokerage firms between February 10, 2017 and February 14, 2017. (FAC ¶¶ 58, 64, 69, 76, 82, 94). The SEC further alleges that such brokerage firms hedged their exposure on Defendants' CFD trades and/or spread bets by trading in Fortress stock on the NYSE between February 10, 2017 and February 14, 2017 (prior to the Announcement), in the exact number of shares of Fortress stock referenced by Defendants' CFD trades. (*Id.* ¶¶ 61, 67, 72, 79, 85, 96). The Court finds that these allegations are sufficient to meet the "in connection with" test. *See Sabrdaran*, 2015 WL 901352, at *10 ("[A] foreign

22

spread bet actually hedged by a broker purchasing call options on the underlying security on a United States exchange creates a sufficient connection with domestic securities.").

Khan's arguments that the "in connection with" test is not met because: (1) brokerage firms have discretion to hedge CFDs by purchasing stock on the NYSE; and (2) the SEC has not adequately pled the necessary connection between Khan's CFD trades and the brokerage firm's hedges, (ECF No. 36-1 at 22-23), are without merit. "Although one could theoretically imagine a case in which a CFD was purchased and the seller decided not to hedge the transaction by purchasing the underlying security, that did not happen here[.]" *Maillard*, 2014 WL 1660024, at *2. Moreover, the Court finds that the SEC has adequately pled the causation and temporal proximity between each of Defendants' CFD trades and the brokerage firms' matching trades in Fortress shares on the NYSE. (FAC ¶¶ 58-87, 94-98). Accordingly, Khan's 12(b)(6) motion is denied in part.

Khan and the QAZE Defendants further contend that the Exchange Act does not apply extraterritorially to the foreign-based transactions at issue in the FAC. (ECF Nos. 36-1 at 24-27; 46 at 20-21). In *Morrison v. National Australia Bank Limited*, the Supreme Court held that "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." 561 U.S. 247, 273 (2010). For the same reasons as set forth above, the Court finds that the foreign-based transactions at issue in the FAC meet the "in connection with" test and are therefore consistent with *Morrison*. Accordingly, Khan and the QAZE Defendants' 12(b)(6) motions are denied in part.

**B.     Defendant Khan's Motion for an Order Unfreezing Assets**

Khan further asks the Court in his motion to dismiss for an order unfreezing Khan's assets.  (ECF No. 36-1 at 37-39).   On February 24, 2017, the Court issued a temporary restraining order freezing Defendants' assets.  (ECF No. 3).  On March 17, 2017, the Court issued a consent order extending the temporary restraining order.  (ECF No. 10).  The consent order was signed by the SEC, and attorneys from Willkie Farr & Gallagher LLP and Greenberg Traurig, LLP.  (*Id.*).  The consent order was not signed by Khan or his counsel of record. Accordingly, Khan argues that the temporary restraining order freezing Defendants' assets does not apply to him because, without his consent, the order expired, at the latest, on March 24, 2017.  (ECF No. 36-1 at 38).

In response, the SEC maintains that the Court should find that Khan consented to the Court's order because: (1) the parties that did come forward consented; (2) Khan should not be permitted to defeat injunctive relief by refusing to appear until two months after he was properly served with the temporary restraining order; (3) Khan knowingly failed to file opposing papers or otherwise signal an intention to challenge the temporary restraining order; (4) Khan's failure to timely object should be considered "tacit consent;" and (5) the Court has the authority to maintain the "status quo."  (ECF No. 53 at 57-59).  The SEC avers that such a finding is particularly appropriate in this matter because of the risk of imminent dissipation.  (*Id.* at 59).

Despite the SEC's arguments, the Court finds that at this stage of the litigation, the issue before the Court goes beyond whether Khan consented to the Court's order.  Given that the FAC will be dismissed without prejudice, the Court finds that it is appropriate to revisit the consent order through the procedure discussed below.

24

## V.    CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss are granted in part and denied in part and the SEC's FAC is dismissed without prejudice.  To the extent the pleading deficiencies identified by this Court can be cured by way of amendment, the SEC is hereby granted thirty (30) days to file an amended pleading.[8]   In conjunction with the SEC's amended pleading, the SEC is directed to file a separate document, on the same date, showing cause as to why the Court should not dissolve the March 17, 2017 consent order.  Defendants may oppose and the SEC may reply in accordance with the Federal Rules of Civil Procedure and the District of New Jersey's Local Rules.  Pending the Court's adjudication of the order to show cause, the March 17, 2017 consent order shall remain in effect.  An appropriate Order accompanies this Opinion.


DATED: September 27, 2018


_____
       CLAIRE C. CECCHI, U.S.D.J.


---

[8] Despite the QAZE Defendants' arguments, the Court does not find that amendment would be futile in this matter.  (ECF No. 59 at 14).  Accordingly, the SEC, as requested, will be given leave to amend.  (ECF No. 53 at 60).